<div align="center">CLARKE *against* MOREY.</div>

THIS was an action of *assumpsit,* on a promissory note made by the defendant to the plaintiff, dated the 5th *June,* 1811, for 209 dollars and 50 cents, payable on demand. The declaration

*Aliens, resident in the United States at the time of war breaking out between* their own country and the *United States,* or who come to reside in the *United States* after the breaking out of such war, under an express or implied permission, may sue and be sued, as in time of peace; and it is not necessary, for that purpose, that such aliens should have letters of safe conduct, or actual license to remain in the *United States,* but a license and protection will be implied, from their being suffered to remain, without being ordered out of the *United States* by the executive.

Whether an alien enemy, residing in his own country at the time war is declared, and at the time of commencing an action here, can maintain such action? *quære.*

was filed in *May* term, 1812. In *August* term last the defendant pleaded, 1. *Non assumpsit;* 2. That the plaintiff ought not to have and maintain his action, &c. because, the defendant says, that the plaintiff is an *alien,* born in foreign parts, out of the allegiance of the *United States of America,* and within the allegiance of a foreign state, to wit, of the united kingdom of *Great Britain* and *Ireland,* and not made a citizen of the *United States of America,* by naturalization, or otherwise, to wit, at, &c. And that the persons exercising the powers of government in the said foreign state, the united kingdom of *Great Britain* and *Ireland* aforesaid, are at war with, and enemies of, the *United States of America,* to wit, at, &c. and that the said plaintiff, so being such alien born, &c. and an enemy of the *United States of America,* and not made a citizen by naturalization, or otherwise, entered and came into the *United States of America,* and still remains therein, without any letters of safe conduct from the President of the *United States of America,* or any license to be, reside or remain in these *United States of America:* And this the said defendant is ready to verify, wherefore he prays judgment if the said plaintiff ought further to have or maintain his aforesaid action thereof against him," &c.

To this plea there was a demurrer, and joinder in demurrer.
The cause was submitted to the court without argument.

KENT, Ch. J. delivered the opinion of the court. The second plea states that the plaintiff is an alien, born out of the allegiance of the *United States,* and under the allegiance of the king of the united kingdom of *Great Britain* and *Ireland,* and not naturalized, and that war exists between the *United States* and the said kingdom; and that the plaintiff came into the *United States* and remains here without any letters of safe conduct from the President of the *United States,* or any license to remain here.

This plea is not without precedent in the *English* books; (*Rast. Ent.* 252. b. 605. b. *Denier* v. *Arnaud,* 4 *Mod.* 405. the record of which plea Lord *Kenyon,* in 8 *Term Rep.* 167. says he had examined;) but there are many and weighty reasons why it cannot be supported. To render the plea of alien enemy good, it seems now to be understood to be the law of *England* that the plea must not only aver that the plaintiff was an alien enemy, but that he was adhering to the enemy. The disability is confined to these two cases; 1. Where the right sued for was acquired in

actual hostility, as was the case of the ransom bill in *Anthon* v. *Fisher;* (*Doug.* 649. note.) 2. Where the plaintiff, being an alien enemy, was resident in the enemy's country; such was the form of the plea in *George* v. *Powell,* (*Fortesc.* 221.) and in *Le Bret* v. *Papillon;* (4 *East,* 502.) and such was the case with the persons in whose behalf, and for whose benefit, the suit was brought upon the policy, in *Brandon* v. *Nesbitt.* (6 *Term Rep.* 23.)

It was considered in the common pleas, at *Westminster,* as a settled point, (*Heath,* J. and *Rooke,* J. in *Sparenburgh* v. *Bannatyne,* 1 *Bos. & Pull.* 163.) that an alien enemy under the king's protection, even if he were a prisoner of war, might sue and be sued. This point had long before received a very solemn decision in the case of *Wells* v. *Williams.* (1 *Ld. Raym.* 282. 1 *Lutw.* 34. S. C. 1 *Salk.* 46.) It was there decided that if the plaintiff came to *England* before the war, and continued to reside there, by the license and under the protection of the king, he might maintain an action upon his personal contract; and that if even he came to *England* after the breaking out of the war, and continued there under the same protection, he might sue upon his bond or contract; and that the distinction was between such an alien enemy, and one *commorant* in his own country. The plea, in that case, averred that the plaintiff was not only born in *France,* under the allegiance of the *French* king, then being an enemy, but that he came to *England,* without any safe conduct, and the plea was held bad on demurrer. It was considered, that if the plaintiff came to *England* in time of peace, and remained there quietly, it amounted to a license, and that if he came over in time of war, and continued without disturbance, a license would be intended. It is, therefore, not sufficient to state that the plaintiff came here without safe conduct. The plea must set forth, affirmatively, every fact requisite to prove that the plaintiff has no right of action. It is not to be favoured by intendment. This was the amount of the decision in *Casseres* v. *Bell;* (8 *Term Rep.* 166.) and one of the judges, in that case, referred to the decision in *Wells* v. *Williams,* as authority, and so it has uniformly been considered in all the books; and all the former precedents and *dicta* that are repugnant to it may be considered as overruled. Though there is a loose and unsatisfactory note of *Sylvester's Case,* in 7 *Mod.* 150. which was a few years later, and looks somewhat to the contrary; yet it never has been considered as affecting the former decision. Indeed, the law on this subject has undergone a progressive improvement.

ALBANY,
Jan. 1813.

CLARKE
v.
MOREY.

The doctrine once held in the *English* courts, that an alien's bond became forfeited by the war, (*Year Book*, 19 *Edw.* IV. pl. 6.) would not now be endured. The plea is called in the books an odious plea, and the latter cases concur in the opinion that the ancient severities of war have been greatly and justly softened, by modern usages, the result of commerce and civilization.

In the case before us, we are to take it for granted (for the suit was commenced before the present war) that the plaintiff came to reside here before the war, and no letters of safe conduct were, therefore, requisite, nor any license from the president. The license is implied by law and the usage of nations; if he came here since the war, a license is also implied, and the protection continues until the executive shall think proper to order the plaintiff out of the *United States;* but no such order is stated or averred. This is the evident construction of the act of congress of the 6th *July*, 1798, entitled "An act respecting alien enemies." (Sess. 1. cong. 5. c. 73.) Until such order, the law grants permission to the alien to remain, though his sovereign be at war with us. A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity.

The right to sue, in such a case, rests on still broader ground than that of a mere municipal provision, for it has been frequently held that the law of nations is part of the common law. By the law of nations, an alien who comes to reside in a foreign country, is entitled, so long as he conducts himself peaceably, to continue to reside there, under the public protection; and it requires the express will of the sovereign power to order him away. The rigour of the old rules of war no longer exists, as *Bynkershoek* admits, when wars are carried on with the moderation that the influence of commerce inspires. It may be said of commerce, as *Ovid* said of the liberal arts : *Emollit mores, nec sinit esse feros.*

We all recollect the enlightened and humane provision of *Magna Chartâ* (c. 30.) on this subject; and in *France* the ordinance of *Charles* V. as early as 1370, was dictated with the same magnanimity ; for it declared that in case of war, foreign merchants had nothing to fear, for they might depart freely with their effects, and if they happened to die in *France*, their goods should descend to their heirs. (*Henault's Abrégé Chron.* tom. 1. 338.) So all the judges of *England* resolved, as early as the time of

*Henry* VIII. that if an alien came to *England*, before the declaration of war, neither his person, nor his effects, should be seized in consequence of it. (*Bro.* tit. *Property*, pl. 38. *Jenk. Cent.* 201. *Case* 22.) And it has now become the sense and practice of nations, and may be regarded as the *public law of Europe*, (the anomalous and awful case of the present violent power on the continent excepted,) that the subjects of the enemy, (without confining the rule to merchants,) so long as they are permitted to remain in the country, are to be protected in their persons and property, and to be allowed to sue as well as to be sued. (*Bynk. Quæst. Jur. Pub.* b. 1. c. 7. c. 25. s. 8.) It is even held, that if they are ordered away, in consequence of the war, they are still entitled to leave a power of attorney, and to collect their debts by suit. (*Emerigon, Traité des Assurances*, tom. 1. 567.)

Modern treaties have usually made provision for the case of aliens found in the country, at the declaration of war, and have allowed them a reasonable time to collect their effects and remove. *Bynkershoek* gives instances of such treaties, existing above two centuries ago; and for a century past, such a provision has become an established *formula* in the commercial treaties. *Emerigon*, who has examined this subject with the most liberal and enlightened views, considers these treaties as an affirmance of common right, or the public law of *Europe*, and the general rule is so laid down by the later publicists, in conformity with this provision. (*Vattel*, b. 3. c. 4. s. 63. *Le Droit Public de L'Europe*, par *Mably. Œuvres*, tom. 6. 334.) Some of these treaties have provided that foreign subjects should be permitted to remain and continue their business, notwithstanding a rupture between the governments, so long as they behave peaceably; (*Treaty of Commerce between Great Britain and France, in* 1786, *and of Amity and Commerce between Great Britain and the United States, in* 1794;) and where there was no such treaty, the permission has been frequently announced in the very declaration of war. Sir *Michael Foster* (*Discourse of High Treason*, 185, 186.) mentions several instances of such declarations; and he says that the aliens were thereby enabled to acquire personal chattels, and to maintain actions for the recovery of their personal rights, in as full a manner as alien friends. The act of congress of *July*, 1798, before alluded to, provides, in cases where there may be no existing treaty, a reasonable time, to be ascertained and declared

by the president, to alien enemies resident at the opening of the war, "for the *recovery*, disposal and removal of their goods and effects." This statute may be considered, in this respect, as a true exposition and declaration of the modern law of nations.

The opinion that wars ought not to interfere with the security and collection of debts has been constantly gaining ground, and the progress of this opinion is worthy of notice, as it will teach us with what equity and liberality, and with what enlarged views of national policy, the question has been treated. A right to confiscate the debts due to the enemy was the rigorous doctrine of the ancient law; but a temporary disability to sue, was all *Grotius* (b. 3. c. 20. s. 16.) seemed willing to allow to hostilities. Since his time, continued and successful efforts have been made to strengthen justice, to restrain the intemperance of war, and to promote the intercourse and happiness of mankind. The power to collect debts, notwithstanding the event of war, is not an unusual provision in the conventional law of nations. In the treaty of commerce between *England* and *France*, in 1713, it was provided by the 2d article, that in case of war, the subjects of each power residing in the dominions of the other, should be allowed six months to retire with their property, and in the mean time, should be at full liberty to dispose of the same, "and the subjects on each side were to have and enjoy good and speedy justice, so that during the said space of six months they may be able to recover their goods and effects." So also in the treaty of commerce between *Great Britain* and *Russia*, in 1766, and again in 1797, it was provided, that in case of war, the subjects of each were to be allowed one year to withdraw with their property; and they were also authorized to substitute others to collect their debts for their benefit, "which debts the debtors should be obliged to pay in the same manner as if no such rupture had happened." A similar provision, in substance, was inserted in the treaty between the *United States* and *Russia*, in 1785; and in the treaty of commerce between the *United States* and *Great Britain*, in 1795, the government of each country was prohibited to interfere, either by confiscation or sequestration, with private contracts, and it was expressly declared to be unjust and impolitic, that the debts of individuals should be *impaired* by national differences.

The case before us does not raise the question, nor do we give any opinion in favour of the right of action by aliens who resided in the enemy's country when war was declared, and when the ac-

tion was commenced. The cases appear to be against such right. But as to aliens who were residents with us when the war broke out, or who have since come to reside here, by a presumed permission, the authorities seem to be decisive. And whether we consider this case in reference to the decisions of the *English* courts, to the act of congress, or to the sense of *European* nations, declared in their treaties, and by their writers on public law, the plea must be overruled; and the plaintiff is entitled to judgment, upon his demurrer.

<div style="text-align:right">

ALBANY,
Jan. 1813.

</div>

<div style="text-align:center">

Judgment for the plaintiff.