Thomas Henderson and Thomas Calloway, Plaintiffs in Error, *v.* The State of Tennessee.

If the defendant in an ejectment suit claims a right to the possession of land derived under a title which springs from a reservation in a treaty between the United States and an Indian tribe, and a State court decides against the validity of such title, this court has jurisdiction, under the twenty-fifth section of the Judiciary Act, to review that decision.

But if such defendant merely sets up the title of the reservee as an outstanding title, and thus prevents a recovery by the plaintiff, without showing in himself a connection with the title of the reservee, and then a State court decides against the defendant in the ejectment, this court has no jurisdiction to review that decision.

In order to give jurisdiction to this court, the party must claim the right for himself, and not for a third person, in whose title he has no interest.

In error to the Supreme Court of Tennessee.

An action of ejectment was brought in the Circuit Court for

Monroe County by the lessee of the State of Tennessee, against Richard Fen, for a tract of land at Toqua, with notice to R. Stapp, W. F. Brown, John Beatty, and Solomon Aikin, as tenants in possession, indorsed, "Den, Lessee of the State, *v.* Fen, &c., to Henderson and Calloway, issued 27th January, 1841." The declaration and notice being returned by the sheriff as served on the tenants in possession, Stapp, Brown, Beatty, Aikin, they appeared; and on the application of Thomas Henderson and Thomas H. Calloway, they were, "by leave of the court, admitted to defend in the room and stead of the tenants sued," entered into the common rule, and pleaded not guilty.

The material facts of the case are, that the land in controversy was a school section, and that the School Commissioners had taken possession of and held it until a law was passed by the legislature of Tennessee directing the school lands to be sold. About that time one John Lowry, professedly as attorney and agent of Toqua Will, obtained possession of the land, and retained it until about 1836, when the School Commissioners regained the possession, and retained the same until 1837 or 1838. Then Thomas Henderson, one of the plaintiffs in error, got possession of the tract for the heirs of one Andrew Miller, under which title it has since been held.

Andrew Miller, at the date of the Cherokee treaty of 1817, was the head of an Indian family, and resided in the Cherokee nation, east of the Mississippi; about the 1st of March, 1818, he settled and made improvements on the land in dispute; and on the 24th of May, 1818, registered his name in the office of the Cherokee agent for a reservation in right of his wife, and designated, on the books of said agent, this land as the location by him selected for reservation. From that time until he was killed (August, 1818), he, with his wife and part of his family, resided on the land, claiming it as a reservation, on which he said he intended to live and die. A few days after his death, his widow sent for John Black, and requested him to take possession of the land and hold it for her and her children. Black offered her $1,000 for her claim, which was refused. Black was placed in possession in the fall of 1818 by Mrs. Miller and George Hicks and James Chisolen, two Cherokees who had taken charge of Miller's estate. Two of Miller's children lived with Black, were sent to school, and the expense paid out of the profits of the land. Black held possession for the children of Miller, who remained with him till put off by the School Commissioners in the spring of 1822. Afterwards, Thomas Henderson got possession for the children of Andrew Miller. The land was included in the cession made to the United States by the Cherokee treaty of 1819.

The court instructed the jury, that "although the ancestor, Andrew Miller, registered his name for the place in dispute, and took possession thereof in the spring of 1818, and died upon the place in July or August of that year, and before the treaty of 1819, no title vested in him, and consequently none could vest or descend to his heirs."

Verdict for plaintiffs. On appeal to the Supreme Court of Tennessee, the judgment of the Circuit Court of Monroe was affirmed. Thereupon the case is brought before this court by writ of error, under the twenty-fifth section of the act of September 24, 1789.

The cause was argued by *Mr. Bibb* and *Mr. Eaton*, with whom was *Mr. Green*, for the plaintiffs in error, and *Mr. Andrew Erving* and *Mr. Stanton*, for the defendants in error.

As the case was dismissed for want of jurisdiction, only so much of the arguments of counsel will be inserted as is applicable to the point on which the case turned.

*Mr. Bibb*, for the plaintiffs in error.

That part of the judge's charge to the jury is relied on to defeat the jurisdiction, wherein he said, "that it was admitted that the defendants had not any title in themselves, but relied solely on an outstanding title in the heirs of Andrew Miller."

This part of the judge's charge to the jury is excepted to, and is as erroneous as the other member of his charge in exposition of the treaties. There is no such admission in the record; no such admission was given in evidence; it is an unwarrantable assumption; it is repelled by what had been done of record, by the court, and by the parties, and is contrary to the testimony.

Henderson and Calloway were not the tenants on whom the declaration was served, but were received and admitted by the court to defend "in the room and stead of the tenants sued." According to the principles which govern the action of ejectment, it was necessary that Henderson and Calloway should show that there was a privity between them and the tenants in possession, that there was a connection and coincidence between the possession held by the tenants and the rights and interests of those admitted in their stead, so that there should be no collusive change or shifting of the possession to the injury of a third party, who might thereby be put to an ejectment to recover the possession which his tenants had surrendered improperly; "because there is a great difference between being plaintiff or defendant in ejectment." Fairclaim on dem.

of Fowler v. Shamtitle, 3 Burr. 1290, 1294, 1295, 1300, 1301, 1302.

A mere stranger to the possession shall not be admitted. Troublesome v. Estill, 1 Bibb, 128; Jackson v. McEvoy, 1 Caines, 151; Jackson v. Stiles, 10 Johns. 69.

Under the term *landlord*, the courts include every one from whom the possession is derived, and who might sustain an injury by eviction; they will be admitted to defend. Crockett v. Lashbrook, 5 Monroe, 539.

No person is admitted to defend in ejectment unless he be tenant, and is, or has been, in possession, or receives the rent; because it is an act of champerty for any person to interpose and cover the possession with his title; and to make any person a defendant, who was not concerned in the possession of the tenement, was a mischief at common law. Runnington on Ejectment, p. 70.

But, at common law, to admit a landlord to defend an ejectment is matter of right, for otherwise he might lose his possession by combination between the plaintiff and the tenant in possession. Fenwick v. Gravenor, 7 Mod. 70; Underhill v. Durham, 1 Salk. 256; Fairclaim on dem. of Fowler v. Shamtitle, 3 Burr. 1301; Adams on Ejectment, 229, 230.

If a person should be admitted to defend, whose title is inconsistent with the possession of the tenant, the lessor of the plaintiff may apply to the court, or to a judge at chambers, and have the rule discharged, with costs. Adams on Ejectment, p. 232.

The objection should have been made when Henderson and Calloway applied to be admitted to defend, if they had no title in themselves and were strangers to the possession. The court admitted them; the lessor of the plaintiff, so far from denying their right to be admitted to defend, acquiesced, made an agreement with them that they should admit the land in the declaration described was "a school section in Monroe County"; and also an agreement that they should be admitted under the order made by the court, in room of the tenants in possession, upon giving security to abide the judgment, and pay all costs that should be awarded.

The declaration was indorsed for notice to Henderson and Calloway, showing that, at the institution of the action, they were known to the attorney of the lessor of the plaintiff as the landlords.

The charge of the judge to the jury, after the said Calloway and Henderson had been so admitted to defend, and so dealt with, was illegal and erroneous, a surprise to the defendants, an injustice and wrong at a time which left no remedy but by an

exception to the charge given to the jury, which remedy was pursued.

The plaintiff in ejectment proved, that, in "1837 or 1838, Thomas Henderson got possession for the heirs of Andrew Miller, under which title it has since been held." The charge of the judge to the jury was in contradiction to the act of the court in admitting Henderson and Calloway to defend, instead of the tenants in possession; the plaintiff and the court were estopped by their own acts, by the record, by the evidence, from assuming the position that Calloway and Henderson had no title in themselves, but relied solely on an outstanding title in the heirs of Andrew Miller. If such had been their predicament, they could not, without violating the established principles of law relating to actions of ejectment, have been admitted by the court as defendants in the room and stead of the tenants in possession.

This *ipse dixit* of the judge in his charge to the jury, so excepted to, and so unwarranted, cannot be taken by this court as legal and veritable, so as to defeat a revision of the final judgment of the Supreme Court under the twenty-fifth section of the Judiciary Act of the United States.

A judge, by his charge to the jury, cannot make evidence, cannot create an admission for a party, so as to bind him contrary to the facts, contrary to the record, contrary to the law. Williams *v.* Norris, 12 Wheat. 119. When such a charge is excepted to, it is a proper subject for revision and reversal, equally with any other error or mistake of fact or law committed by the judge.

Putting this unwarranted dictum of the judge out of the way, we come to the question of the jurisdiction of this court to reëxamine the final decision of the Supreme Court of Tennessee in this action of ejectment.

The twenty-fifth section of the act of Congress approved 24th September, 1789 (1 Stat. at Large, 85), provides, —— "That a final judgment or decree in the highest court of law or equity of a State in which a decision in the suit could be had, where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favor of such their validity; or where is drawn in question the construction of any clause of the Constitution, or of a treaty or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party under such clause of said Constitution, treaty, statute, or commission, — may be reëxamined,

and reversed or affirmed, in the Supreme Court of the United States, upon a writ of error," &c. "But no other error shall be assigned or regarded as a ground of reversal, in any such case as aforesaid, than such as appears on the face of the record, and immediately respects the before-mentioned questions of validity or construction of the said Constitution, treaties, statutes, commissions, or authorities in dispute."

In this ejectment the plaintiff claimed, under a law of the State, that the land was lawfully surveyed as of the public domain of the State, and that it was lawfully appropriated as a school section, according to the plan of the surveyor of the State for the Highwassee district; the defendants claimed under the treaties of the United States of 1817 and 1819, with the Cherokee nation of Indians, authorizing reservations of 640 acres to the heads of Indian families who elected to become citizens of the United States, and under a reservation duly taken by Andrew Miller, for himself and his family, in accordance with the said treaties.

Upon the face of the record in this case it appears, that "the principal question raised was, whether from the above facts Miller's children had any interest in said land as a reservation by virtue of the registration and residence of their father at Toqua, the place in dispute"; and it farther appears that the court instructed the jury, "that although the ancestor, Andrew Miller, registered his name for the place in dispute, and took possession thereof in the spring of 1818, and died upon the place in July or August of the same year, and before the treaty of 1819, no title vested in him, Andrew Miller, and consequently none could vest or descend to his heirs."

The case, stripped of the fictions used in actions of ejectment, is substantially a question between the commissioners of the school fund of the State of Tennessee, claiming under a law of that State, and the admitted defendants, Calloway and Henderson, claiming and holding possession of the land under the treaties of the United States; and the court gave a construction of the treaties adverse to the right, title, privilege, and possession claimed under those treaties. It is a conflict of State law and State authority with the rights claimed under the authority and treaties of the United States, and so appears plainly and palpably upon the face of the record.

But to evade the jurisdiction of this court to reëxamine and reverse or affirm the final decision of the Supreme Court of Tennessee, so plainly within the reason and exigencies of the twenty-fifth section of the Judiciary Act, in a case so palpably requiring the exercise of the jurisdiction of the Supreme Court of the United States, to give the true construction of

these treaties of 1817 and 1819, and to maintain the supremacy of the laws of the United States, it is here argued, that Henderson and Calloway are not in a predicament to prosecute this writ of error.

Do not the treaties protect a possessory right held under them equally with the rights in fee simple? Is a defendant in a possessory action bound to show that he is tenant in fee? Shall a defendant in a possessory action, against whom the plaintiff has obtained an erroneous judgment, be barred of a writ of error, because on the trial he did not deduce to himself a title in fee?

That the erroneous dictum, the unfounded assumption, the gratuitous *ipse dixit*, of the judge, in his charge to the jury, is no bar, cannot alter the fact or the law, need not be farther argued.

The action of ejectment is a possessory action, invented by the courts to try possessory titles, unembarrassed by the difficulties attendant upon real actions. The declaration is a fiction, the plaintiff's name is fictitious, the defendant's name is fictitious, the lease is a fiction, the casual ejector's name is fictitious; yet all these fictions have been regulated and moulded by courts and by legislation into a system, governed by known and established principles, well adapted to the purposes of substantial justice. The distinction between a real action founded upon a right of property, and a possessory action founded upon a right of possession, is well established, and the ejectment is confined to cases in which the claimant has a right to the possession. When the claimant has only a right of property, or a right of action remaining to him, his entry upon the land would be illegal, not sufficient to enable him to make a real valid lease, and he could not maintain an ejectment, for principles remain, although the forms of proceeding are changed.

Blackstone, in his Commentaries (book 2, ch. 30, pp. 195 to 199), tells us of four several degrees requisite to form a complete title to lands;—1st. The lowest and most imperfect degree of title consists in the mere naked possession of the estate, without any apparent right, or shadow of right, to continue that possession; which is, however, *primâ facie* evidence of a legal title in the possessor, and it may, by length of time (and negligence of him who hath the right), ripen into a perfect indefeasible title. 2d. The next step to a good and perfect title is the right of possession. 3d. The mere right of property, *jus proprietatis*, without either possession or even the right of possession, where the estate of the owner is divested and " put to a right." 4th. A complete title, "*jus duplicatum*," or " *droit droit*," where there is "*juris et seisinæ conjunctio*."

27 *

As the action of ejectment is a possessory action, founded on a right to the possession, and can be maintained by a right to the possession even for a term of years, so it.can be defended by one having the actual possession. A tenant, under an unexpired lease from his landlord, may successfully defend an action of ejectment against him by his landlord.

In the action of ejectment, the right of possession only is tried, not the ultimate mere right of property; and the plaintiffs must show a right of entry. Taylor *v.* Hord, 1 Burr. 119; Troublesome *v.* Estill, 1 Bibb, 128; Adams on Ejectm. 10, 33, 247; Runnington on Ejectm. 21, 42.

The party in possession is presumed to be the owner until the contrary is proved. The possession of the defendant gives him a right against every person who cannot show a good right to possession, — a good right to change the possession. Roe on dem. Haldane *v.* Harvey, 4 Burr. 2487, 2488; 2 Black. Comm. ch. 13, p. 196.

The lessor of the plaintiff and the tenants in possession, or persons admitted to defend in place of the tenants in possession, " are parties, and the only parties, to an ejectment." Aslin *v.* Parkin, 2 Burr. 667, 668.

The possession of the tenants sued, and the possession of the defendants, Calloway and Henderson, admitted in place and stead of the tenants, is connected with, and knit to, the title of Miller's children, growing out of the treaties of the United States with the Cherokee nation of Indians; so the plaintiff himself proved by his own witnesses. The record states, that " the principal question raised was, whether, from the above facts, Miller's children had any interest in said land, as a reservation, by virtue of the registration and residence of their father at Toqua, the place in dispute "; and the court gave instruction to the jury containing a construction of the treaties adverse to the right, title, and interest of Miller's children, and of the defendants in possession under the title growing out of the treaty.

To the opinion of the court, in admitting Henderson and Calloway as defendants " in the room and stead of the tenants sued," " to defend in the room of the tenants in possession," the plaintiff took no bill of exception; he acquiesced and assented of record. It cannot now be alleged that the evidence adduced by Calloway and Henderson, of their being landlords to the tenants in possession, was insufficient to admit them to defend in the room and stead of the tenants upon whom the declaration was served.

That question cannot now be raised in this court. It is not now an open question. Henderson and Calloway are the defendants, against whom the plaintiff has taken his judgment

for the possession and for the costs of suit. They had the right to appeal, and did appeal, to the Supreme Court of Tennessee; they have the right, under the twenty-fifth section of the Judiciary Act, to have the construction of the treaties, as given in the Circuit Court of Monroe County, and as affirmed by the Supreme Court of Tennessee, reëxamined and reversed or affirmed by the Supreme Court of the United States.

The Supreme Court of Tennessee, in affirming the judgment of the Circuit Court of Monroe County, affirmed the construction of the treaties as set forth in the bill of exceptions.

The following cases, decided upon the jurisdiction of this court, under the twenty-fifth section of the Judiciary Act, will suffice to sustain the jurisdiction in this case. Craig v. The State of Missouri, 4 Peters, 229; Worcester v. The State of Georgia, 6 Peters, 515, 582, 583, 597; Crowell v. Randell, 10 Peters, 391 to 399.

In this case of Crowell v. Randell, fourteen previous decisions of this court upon this twenty-fifth section are reviewed, and the doctrine reaffirmed, " that it is not necessary that the question should appear on the record to have been raised, and the decision made, in direct and positive terms, ' ipsissimis verbis,' but it is sufficient if it appears by clear and necessary intendment, that the question must have been raised, and must have been decided, in order to have induced the judgment."

The case of Owings v. Norwood's Lessee, 5 Cranch, 344, has been relied on as being adverse to the jurisdiction of this court, in the case under consideration. Norwood's lessee claimed under a grant from the State of Maryland, dated in June, 1800, founded upon a confiscation of the land called Brown's Adventure. Owings, to defeat the action of Norwood's lessee, attempted to set up, as an outstanding title, a patent of the year 1695, to Thomas Brown, who conveyed to John Gadsby, who conveyed to Aaron Rawlins, in 1703, who mortgaged in fee to Jonathan Scarth, by deed of 1706, with a proviso to be void upon payment of £800, with interest, on the 13th of May, 1709. This mortgage to Scarth, Owings set up to show a title outstanding against Norwood's lessee, contending that the mortgage to Scarth was protected by the treaty of 1794, between the United States and Great Britain, from confiscation, and was still a security for the money to the representatives of Scarth, who were proved to be still living in England. But the Court of Appeals of Maryland decided, that, at the expiration of the time for payment limited in the deed to Scarth, a complete legal estate vested in the mortgagee, Scarth, liable to confiscation; and was confiscated by virtue of the act of Maryland of October session, 1780, ch. 45, and vested in the State; and that the British treaty did not affect the plaintiff's title.

Upon the writ of error to the Supreme Court of the United States, the court decided that the case of Scarth's representatives was not protected by the treaty, and that the right set up by the plaintiff in error did not grow out of the treaty. And most certainly that right, so set up by Owings, originated more than fourscore years before the treaty. Surely that case has no similitude to this. The explanation of Chief Justice Marshall (5 Cranch, 348) maintains the jurisdiction of this court in the case now under consideration. A right in fee simple, growing out of a treaty, is protected in whole, and in all its parts and interests, which are holden or possessed, subordinate to the estate in fee; and the Judiciary Act will come in aid of the protection, when the lowest grade of such interest shall be drawn in question in the State courts, either directly or " incidentally." Such is the true effect of the decision in Owings *v.* Norwood's Lessee; such is the true construction of the Constitution and the twenty-fifth section of the Judiciary Act.

*Mr. Ewing, contra.*

This court cannot obtain jurisdiction by mere consent of parties. It was the policy of the law to commit to this court certain specified cases arising in the State courts. If the case is within the Judiciary Act, jurisdiction follows. If not, no matter what the parties may have agreed, or what they may be estopped from denying, or what the court below may have permitted, or what it may be estopped from denying, this court has no jurisdiction of the matter. It might be true, then, as it has been urged, that, after we had admitted the plaintiffs in error to defend in the court below, we might be estopped from denying that they had title in themselves; and did not rely solely on an outstanding title in the heirs of Andrew Miller; and yet neither the admission nor the estoppel would confer jurisdiction on this court. This court will take notice of its own jurisdiction. And no matter at what stage of the proceedings a want of jurisdiction may appear, or in what manner it may appear, the court will act upon it, notwithstanding any technical or other admissions of the parties to the record.

By the statute of Tennessee, children cannot be concluded unless they are brought before the court. Now here you would conclude the children of Miller, though the facts do not show any privity between the plaintiffs in error and the heirs of Miller. Henderson and Calloway set up an outstanding title in the heirs of Miller, under the treaty, and attempt thus to give jurisdiction to this court. And if this court entertain the case, it determines the rights of the heirs of Miller under the treaty, although they are not before the court. And if the rights of

the heirs of Miller should ever hereafter be brought before this court for adjudication, it would be held that, by the present decision, their rights are determined.   5 Cranch, 344.

*Mr. Stanton,* on the same side.

Is there any proper proof of any such privity between the plaintiffs in error and the heirs of Miller, as would enable the former to set up the title of Miller's heirs as their own, and thus bring it within the treaty?   The bill of exceptions upon its face shows that it was put in by consent, and was undoubtedly drawn up by the attorney, and signed by the judge, as is the practice in Tennessee.   The facts were not set down precisely in order as they were proven.

The argument on the other side would lead us to the conclusion that it is the duty of this court " *ampliare jurisdictionem.*" We maintain precisely the reverse; and in this case especially, that the mere fact of the defendants below setting up an outstanding title, out of themselves, without a claim in themselves under the treaty, cannot confer jurisdiction.   The true construction of the statute is, that the persons intended to be benefited must have a direct interest under the statute or treaty, and specially set up that interest in the State court. Otherwise, the true holders of the title would have their rights adjudicated, when they were not parties to the suit.   5 Cranch, 344; 12 Wheat. 117.

Inasmuch as the plaintiffs in error are only entitled to come into this court, under the Judiciary Act, by virtue of the outstanding title in the heirs of Andrew Miller, they are entirely precluded from the forum for want of privity with those heirs.

*Mr. Eaton,* in reply and conclusion.

Under the twenty-fifth section of the Judiciary Act, the only question is, not one of *meum* and *tuum,* but whether the construction of a treaty or law of the United States is involved. The eighth article of the treaty of 1817 gave a life estate to the head of a family, dower to the widow, and remainder in fee to the children.   Andrew Miller was the head of an Indian family, and was registered as such.   The land claimed, it is true, was not within that ceded by the treaty of 1817, but by that of 1819.   But we claim that the true construction of those treaties is, that the latter was but the continuation of the former. And it is this construction of those treaties which gives us a standing in this court.   It is not a mere outstanding title which we set up.   The bill of exceptions expressly states, that " Thomas Henderson (one of the plaintiffs in error) got possession for the heirs of Andrew Miller, under which title it has

since been held." We hold under that title, then. And it is our title under the heirs of Andrew Miller, and their title under the treaties of 1817 and 1819, which is in fact one and the same title, that is involved. The children of Miller were actually on the land enjoying the rents until put off by the School Commissioners. The statutes of the State of Tennessee override the treaties of the United States.

Mr. Chief Justice TANEY delivered the opinion of the court.

The first question to be decided in this case is, whether the court has jurisdiction.

The case is brought before us by a writ of error to the Supreme Court of the State of Tennessee. It appears by the record, that the decision turned upon the title of Andrew Miller to the lands in question, under the treaties of 1817 and 1819, with the Cherokee nation. Andrew Miller was the head of an Indian family when the first treaty was made, and it was insisted at the trial that the title to this land was in his heirs, by virtue of the reservations contained in these treaties. The decision was against the validity of this title, and the question is, whether the plaintiffs in error claimed under it. If they did not, this court has no power to revise the judgment of the State court.

It was an action of ejectment. The plaintiffs in error were permitted by the court to appear as defendants. They were not the tenants in possession when the suit was brought. The process was served on other persons named in the proceedings, and the record does not show in what character, or upon what ground, the plaintiffs in error were permitted to appear and defend the suit.

Andrew Miller died in 1818, and the land in dispute was held for his children until 1822, when the State took possession of it, claiming title. The widow of Miller removed to the Cherokee nation, in their new settlement on the west of the Mississippi, soon after his death, and the children followed her when the State took possession of the land; and they have all remained there ever since. The right to this property appears to have been continually in dispute since the treaties above mentioned, and after the removal of Miller's children the possession changed hands several times before this suit was brought.

The bill of exceptions states that Henderson, one of the plaintiffs in error, got possession for the heirs of Andrew Miller in 1837 or 1838, under which title it was held down to the commencement of this suit. But it is not stated that he or Calloway had any authority from the heirs of Andrew Miller.

On the contrary, it is expressly stated that they set up no title in themselves, but relied for their defence on an outstanding title in the heirs of Andrew Miller.

Now, in the language of ejectment law, an outstanding title means a title in a third person, under which the tenant in possession does not claim. And as no one has a right to enter upon the land and eject the tenant but the person holding the legal title, if the tenant can show that the title was in a third person it defeats the action, although the tenant sets up no title in himself. This was the defence in the case before the court. If they had been in possession under the heirs of Miller, as tenants holding under their authority, then the title of the heirs would have been the title of the tenants, and they could have defended their possession, by showing title in themselves derived from the heirs. For although the landlord may appear and defend on account of his own interest, yet his appearance is not necessary for the protection of the tenant. The tenant may show the title of the landlord, and his own right derived from him. And if the plaintiffs in error had made this defence, they would evidently have claimed a right to the possession under a treaty of the United States; and as the decision was against the right, this court would have jurisdiction, and might reverse the judgment if they deemed it erroneous. But they claimed no right to the possession under this title. They set it up as a title in a third person, not to show a right in themselves, but that the lessor of the plaintiff had none, and therefore had no right to enter upon them. They might have been mere trespassers or intruders, without any authority from the legal owner, and yet this defence would have been a good one, if the outstanding title was superior to that produced by the lessor of the plaintiff.

The right to make this defence is not derived from the treaties, nor from any authority exercised under the general government. It is given by the laws of the State, which provide that the defendant in ejectment may set up title in a stranger in bar of the action. It is true, the title set up in this case was claimed under a treaty. But to give jurisdiction to this court, the party must claim the right for himself, and not for a third person in whose title he has no interest. The case in 5 Cranch, 344, Owings *v.* Norwood's Lessee, is in point. And the same doctrine was reaffirmed in Montgomery *v.* Hernandez, 12 Wheat. 129; Fulton *v.* McAffee, 16 Peters, 149; and Udell *v.* Davidson, 7 Howard, 769.

The heirs of Miller appear to have no interest in this suit, nor can their rights be affected by the decision. The judgment in this case is no obstacle to the assertion of their title in an-

other suit, brought by themselves or any person claiming a legal title under them. And in such a suit this court would have jurisdiction upon a writ of error, whether the judgment was in a Circuit Court of the United States or in a State court.

But this writ of error must be dismissed for want of jurisdiction.

Mr. Justice WOODBURY dissented from the opinion delivered by the court.

My view of the present case is, that this tribunal has jurisdiction over it, and, also, that the judgment below ought to be reversed.

In order to enable us to exercise jurisdiction in this class of causes, it need only appear, that in the State court some right or title set up under a treaty with the United States was drawn in question and overruled. The title set up below by the defendants seems very clearly to have been one of this character. The record states that "it was proved by sundry witnesses that Andrew Miller was the head of an Indian family; resided in the Cherokee nation east of the Mississippi at the date of the treaty of 1817, between the United States and the Cherokee nation; that from the spring of 1818 till his death in July or August of the same year, he resided on the land in dispute, claiming the same as a reservation, where he said he intended to live and die; and that the land in dispute was not ceded by the treaty of 1817, but was by that of 1819." Now, on such facts it is averred and admitted that the court instructed the jury, " that although the ancestor, Andrew Miller, registered his name for the place in dispute, and took possession thereof in the spring of 1818, and died upon the place in July or August of the same year, and before the treaty of 1819, no title vested in him, Andrew Miller, and consequently none could vest or descend to his heirs."

It is difficult to conceive how it is possible to say, that a title under a treaty was not thus set up or drawn in question, and was not overruled by the State court, so as to give to this court jurisdiction to revise any error committed. Such a title seems to have been the only one interposed against a recovery, and was the only one decided on below, and was there explicitly overruled.

The sole argument offered here to obviate this conclusion does not appear to have been there presented or relied on. It is, that, though Miller's title was there set up and overruled, it was not set up as existing in the tenants, or as the title under which they entered or claimed.

But the Judiciary Act, in order to give to this court jurisdiction under the twenty-fifth section, does not in terms require that such title should have been entirely vested in the tenants. It seems sufficient if it was drawn in question, or was set up, and could legally be set up, in defence, and was overruled. (1 Stat. at Large, 85.)

What is *drawn in question* in any case depends on the facts and the law applicable to that particular case. Here the title of Miller's heirs under the treaty, I have already shown, was certainly drawn in question, and as certainly was overruled by the judge.

But it is argued, that the defendant must have had a right under the United States to make the defence, or we have no jurisdiction. That, however, is begging the question on the merits. It seems quite sufficient to have him set up such a right and to have it overruled.

Here, too, the court below seemed to concede, that Henderson possessed such a right under Miller's heirs; but decided against him, on the ground that the right of Miller himself was defective.

Again, the question of right is not the guide, but the question of claim, and the claim being overruled. Nor need the claim be to the whole estate or interest. In such an action as this, the persons in possession may have, in themselves, no title in fee, nor for life, nor even for years. It is sufficient if a mere tenancy at will, for or in behalf of those possessing a larger estate, is claimed.

So it may be only a naked possession, if the legal estate is shown to be in other persons than the plaintiff, the latter not being authorized to disturb the possession of the tenant, unless he has the legal estate. 4 Burr. 2484; 9 Wheaton, 515; Greenleaf's Lessee *v.* Birth, 6 Peters, 302.

Here, however, the defendants appear to have gone further, and to have made a claim in privity with the heirs, or set up a right under Miller and the treaty, though not to the whole interest. In a just view of the record, therefore, they seem to have brought themselves within what is now required, even by the opinion of this court. Because, though the original defendants claimed no title in themselves, unless it was a tenancy at will under Henderson and Calloway, and hence, probably, the latter were requested to defend, and did defend, yet it clearly appears on the record, that the latter set up rights for the heirs of Miller, and relied in defence on the title of those heirs, and the court did not overrule the propriety of such a mode of defence, but the title itself of Miller's heirs set up under the Cherokee treaties.

' The title under the treaty was not only thus set up and overruled, but it was set up by Henderson and Calloway, claiming rights under it in privity under the heirs of Miller.

The widow of Miller, as early as 1818, is proved to have put Black in actual possession of the land, " to hold it for her and the heirs of Andrew Miller." And he, with two of the children, remained in possession and cultivated the land till 1822. No question can exist, that, if Black was the defendant here, he could rightfully protect himself under the Miller title. But it is said that Henderson and Calloway were never, like him, put into possession by the widow or the heirs, and never held it for them with any privity by lease or otherwise. We think differently. Another portion of the record says expressly, after Black had been expelled by the plaintiffs, and the plaintiffs by others, between 1822 and 1837 or 1838, that " Thomas Henderson got possession for the heirs of Andrew Miller, under which title it has since been held."

During the three or four years which ensued before this action was instituted, it would therefore appear, not only that the present defendants were in possession, in person or by others, " for the heirs," which is the very expression used as to Black's possession, but would naturally mean in one case, no less than the other, with the privity or request of the heirs, and as agents for them. But to remove all doubt as to this in respect to Henderson, who entered for the heirs of Miller, the record adds, that under the Miller " title it has since been held."

. Giving a fair construction to all the words in the record, and to all the other facts stated, it is difficult to misunderstand this language. The widow and heirs regarded the reservation as valuable. She refused to sell their rights in it for $ 1,000 offered by Black. It was not abandoned as unworthy of attention; but Black was first put into possession with privity as agent or tenant to them. And after he was expelled, Henderson, as another agent, seems not only to have regained the possession for the heirs, but to have held it by their title since, and probably as their agent or tenant, with like privity. The notice to Henderson, likewise, to take on himself the defence in this case, and his admission by the court to defend, confirm this view. A third person, disconnected entirely with the title or right of possession, would not usually be admitted. 10 Johns. 69; 1 Caines, 151; Fairclaim *v.* Shamtitle, 3 Burr. 1299, 1301. He was doubtless admitted, then, from his connection with Miller's title. Lord Holt says (Comb. 209), " No person is admitted to defend in ejectment unless he be tenant, and is or hath been in possession or receives the rent." Bac. Abr. *Ejectment*, B. 2. Runnington on Ejectment, 192, 199, 201, 209.

It is urged further in objection, that Miller's heirs are not parties here.. Neither is the owner of the fee a party in ejectment in any case where a lessee or agent under him makes a sub-lease and is admitted to defend for his sub-lessee.

Looking to the whole record, then, these considerations seem to dispose of the question of jurisdiction in favor of the original defendants. But the plaintiffs below rely on some detached expressions in the record from which to infer a different result. Such as the judge speaking of " an outstanding title " in Miller's heirs. Probably, as already explained from the whole case, the judge meant, by the words " outstanding title," one which did not exist in the plaintiffs, and one which, though represented by, had not been conveyed to, the defendants by any formal deed. Under that aspect, all is natural, and our jurisdiction is unimpaired. Such a case would be entirely unlike that of Owings *v.* Norwood's Lessee, 5 Cranch, 344. But if he meant by *outstanding title* one which existed elsewhere, but which the defendants did not set up, nor mean to avail themselves of as a defence by their connection with it, he departs in all essentials from the rest of the record, and all the proof in it, that Henderson entered for the heirs of Miller, held it two or three years under their title, and set it up as his defence.

My dissent rests on this view of the case, though it is by no means certain, that, if a naked outstanding title were shown merely to defeat the plaintiff, and not held under nor relied on through any privity in defence, and it was examined by the court below, when set up to defeat the action, we should not ex· ercise jurisdiction to revise the decision, if a treaty connected with that title is there overruled; because the treaty is a part of the defence there, as much as in other cases. It is relied on for exemption in the action as much as in other cases. The title under a treaty is called in question and decided against as fully as in other cases. The dangers from such a defence being overruled by a State court are as serious as in other cases.

So a judgment of a State court is reversable here at all only when in collision with defences offered under authority from the United States. And here the State court not only overruled an authority so set up, but did it in favor of their own State and of their own citizens, and against the valid ty of a claim in behalf of an Indian widow and Indian orphans. On general principles, therefore, and with entire respect for the courts of Tennessee, it would seem proper, that, if any case should be open to revision by another tribunal, it ought to be one of this character.

As it would be of no use to sustain jurisdiction here, unless in favor of the validity of the title overruled, I would add a few words as to the merits being with the Miller title.    It must be conceded, that the title of Miller's heirs ought to be upheld against the plaintiffs, if it became perfected before his death; or if it was so perfected afterwards as to operate or relate back to a time before his death.

The judge below rested his ruling entirely on the position that Miller, dying before the treaty of 1819, though after that of 1817, had acquired no title to the land claimed.    But he had fulfilled all the requisites of the treaty of 1817, not afterwards varied by that of 1819..  He entered on the lands under the treaty of 1817, which extended to territory afterwards, as well as then, ceded.   He improved them under it.   He was the head of an Indian family.   He registered them under it.   See Treaty, art. 8 (7 Stat. at Large, 159).   He resided on them under it. And the only remaining requisite, the census, which had been provided for by the first treaty, was dispensed with by the treaty of 1819 (7 Stat. at Large, 195).   Though his death, then, had intervened, his rights had commenced under the treaty of 1817, and become perfected by it and by that of 1819, ceding the territory and dispensing with the census.    All, then, should relate back to the period of his entry and registration.

It is very familiar law to have proceedings operate back to their commencement, and references need not be extended beyond the common cases of amendments in writs, records, and returns, as well as titles to land confirmed or ratified where before partly completed.   Com. Dig. *Confirmation;*  Vin. Abr. *Relation;* 4 Kent's Com. 450, note; Clary's Heirs v. Marshall's Heirs, 5 B. Monroe, 266; Landes v. Brant, *post,* 348; 12 Johns. 141; 3 Cowen, 75; 12 Missouri, 145.

As this court, in the opinion just delivered, has not gone into the consideration of the validity of the title of Miller's heirs, I forbear further remarks upon it until brought before us in some other action and form, more acceptable to a majority of the members of this tribunal.

Justices McLEAN, WAYNE, and McKINLEY concurred with Mr. Justice WOODBURY.

*Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Tennessee, and was argued by counsel.   On consideration whereof, it is now here ordered and adjudged by this court, that this cause be, and the same is hereby, dismissed for the want of jurisdiction.