Loring, J.,
delivered the opinion of the court:
The petitioners claim of the United States ($30,000) thirty thousand dollars as rent from the first day of January, 1862, to the first day of January, 1867, upon an agreement in writing made the 24th day of January, 1862, between the United States, by Lieutenant H. Gibbs, acting assistant quartermaster, of the one part, and the petitioners of the other part, under which the United States occupied certain premises known as Tift’s wharf, in Key West, in the State of Florida, from the said 1st day of January, 1862, to the day of filing the petition.
And on the evidence the court find the facts to be—
1. That Asa F. Tift was .a citizen of Key West, in the State of Florida, and resided there from 1838 to 1861, and owned and was seized in fee of the premises known as Tift’s wharf in Key West.
2. That he was a member of the convention which passed the ordinance of secession of the State of Florida from the Union, and signed that ordinance on or about the 9th of January, 1861.
3. That on the 21st day of May, 1861, he made his letter of attorney to Charles Tift, of Key West, and thereby authorized him to sell and convey all or any part of his real and personal property “ on the island of Key West,” with the intent of leaving Key West in adherence and allegiance to the State of Florida, in her secession from the United States.
4. -That in said month of May, and after executing and delivering said letter of attorney, the said Asa Tift, in fulfilment of his purpose of joining the confederates against the United -States, left Key West, then and thereafter in the possession of the United States, and went to reside in Albany, in the State of Georgia, and resided there within the confederacy during the whole war of the rebellion; and the said facts were known to the petitioners before December 25, 1861.
5. That on the 28th day of December, 1861, the said Asa F. Tift, by his attorney, the said Charles Tift, conveyed the premises to the petitioners as tenants in common in fee simple by deed of that date, duly executed, delivered, and recorded, in consideration of the sum of $18,000 paid and received.
*32 6. The said sum of $18,000 was paid in the negotiable notes of the respective grantees in the proportion of one-third each — $1,000 payable by'each on demand, and the residue payable in one, two, three, four, and five years, with interest at six per cent., and the said notes were retained by said Charles Tift, during the rebellion, by an agreement between him and the promisors, and were not delivered to said Asa F. Tift till after his pardon. He now holds the same uncollected in any part.
In December, 1861, the officers of the quartermasters’ department at Key West desired possession of Tift’s wharf and its appurtenances for the use of the United States, and it was needed therefor; but the petitioners were disinclined to lease it, and refused to do so, and then, and for the purpose of effecting a lease of it, Major B. H. Hill, commanding at Key West, caused to be issued an order for its seizure in the following terms :
“Order No. 3.] HeaduuaRters Troops, Key West,Fla.,
“January 13, 1862.
“ The property known as Tift’s wharf, including thosehouses, cisterns, offices, and wharf property of every kind, will be taken possession of for the use of the quartermasters’ department of the United States army, an accurate inventory of which will be made, with a view to compensation thereafter.
“By order of Major Hill:
• “Paul Roemer,
“ Lieutenant Fifth Artillery, Post Adjutant.”
And under the pressure of this order an arrangement was made to lease it on the terms mentioned in the contract, which were approved by Major Hill, who cancelled the order for the seizure of the wharf, and the lease was then executed with his sanction and approval.
7. By the said lease or agreement, dated 24th of January, 1862, the petitioners leased the premises to the United States for one year from the 1st day of January, 1862, and as much longer as might be required, for the quartermasters’ department, at an annual rent of $6,000, to be paid quarterly; and under the said agreement the officers of the quartermasters’ department entered upon and took possession of the premises, and used them in the service of the United States .from the 1st day of January, 1862, to the 1st day of January, 1867, with a full knowledge of the facts above stated, viz., that the petitioners derived their title from A. F. Tift, who had adhered in allegiance to the State of Florida in its secession from the Union, and had left *33 Key West and joined the confederates, and was with them in open war with the United States when the deed from him to the petitioners was made and delivered.
8. That no rent has been paid under said agreement or lease, or for the use and occupation of the premises, and the lease was not approved by the Quartermaster General, and was not disapproved till 8th February, 1866.
9. On the 12th day of February, 1866, Brevet Brigadier General Seymour having succeeded to the command at Key "West, issued the following order:
“ Special Order No. 13.] Headquarters Key West, Florida.
“ The accountability for the wharf and storehouse property known as 1 Tift’s’ will be transferred from the papers of the acting assistant quartermaster at this post, to the monthly return of confiscated property, rendered by the commanding officer to department headquarters.
“ By order of Brevet Brigadier General Seymour :
“Paul Koemer,

“Lieut. Fifth U. S. Artillery, Post Adjutant.”

And in the return made by T. Seymour, captain fifth artillery, February 28, 1868, of “ confiscated property occupied by United States military authorities at Key West, Florida,” the premises were specified.
10. The said A. F. Tift received from President Johnson “a full pardon and amnesty for all offences by him (the said Tift) committed, arising from participation, director implied,in the said rebellion,” and said pardon was dated 20th July, A. D.1865.
It is contended, on the part of the United States, that the petitioners cannot maintain this action, because when the deed was made to them by A. F. Tift, he was a confederate, and an enemy to the United States, so that his deecl was void under the rule of law which prohibits contracts between enemies.
This is the rule of law as between subjects of belligerent sovereigns, but the defendant here is not a subject, but a sovereign, and there is no rule of law that prevents a sovereign from contracting with his enemy or his enemy’s grantee. On the other hand, it is common for sovereigns to contract or trade with their enemies, and to license others to do so, and the United States in that way obtained cotton of the confederates during the rebellion. And the books and our own statutes show that licenses to trade with the enemy make a branch of. the law, and they all rest on the right of a sovereign to contract with his enemy.
We think the question here is.:' Are ihe United States parties to *34 this lease? for if they are, it is subject to the rules of law pertaining to leases ; and of these, a cardinal rule is that the lessee cannot, and the court cannot, put in issue the title .of the lessor, for his claim does not depend on his title, hut on the contract of lease.
Whether the United States are parties to the lease or not, depends on the authority of the officers at Key West, who made it, and their action within their authority, and this brings into consideration all the circumstances in which they acted, for the rules of evidence peculiar to leases operate only between the parties to them, and c'an have no application to the question whether the defendants are such party. They must be shown to be parties to the lease before the rules of evidence peculiar to leases can be applied to the case.
On the statement of facts read, it appears that when the deed of Asa F. Tift to the petitioners was made, he was a confederate, and an enemy to the United States, in open war with them, and in the laws of war the rule is absolute that all contracts and peaceful dealings with an enemy are unlawful and void. Every sovereign may enforce or relax the rigor of this rule, and modern practice has excepted from it cases that are not within its reason. Thus, where an enemy has a protection or license to remain in the territory of the sovereign, he may then make contracts for his subsistence, and deal with loyal citizens in his affairs, (3 Wash., C. C., 484; 10 Johns., 69.) So if the enemy is brought as a prisoner into the sovereign’s territory, and held there by his authority, his position is analogous to that of an enemy under a license or protection, and the same privileges are allowed him, (Clarke v. Morey, 10 Johns., 69,) and this is the case cited in the brief of the counsel for the petitioners.
So in the matter of mere title vesting in the enemy, he is allowed to acquire property under the sovereign’s laws. Thus a bequest made or a distributive share accruing to an alien enemy vests in him, and he may recover it when the war has ceased and peace has restored his status in the sovereign’s court, (Park Rep., 267, cited 7 Cranch, 620; Morey v. Clarke, 10 Johns., 69.) So dividends accruing to an alien enemy vest in him, and he may, after the war, recover them, with the interest accruing from their use during the war, (Morey v. Clarke, supra.) So an alien enemy may take title to real estate by devise, for in the case of Fairfax’s devisee v. Hunter’s lessee, 7 Cranch, 603, the court, after advisement, held that a devise made to an alien enemy, vested in him the title of the lands devised, subject, as in the case of an alien enemy, to the sovereign’s power to confiscate them.
But in all these instances the enemy is merely passive, for the *35 bequest, the distributive share, the dividends, and the devise which dispenses with seizin require no action on his part, and involve and imply no pacific dealings between enemies ; but in the case of a deed it is not. so — that is a bargain on terms to be fixed and agreed to, as was the case here; a consideration and price is to be fixed, and a mutual understanding or assent, which is action on both sides, is to be reached, and in this the grantor and grantee are equally actors. It is, therefore, a traffic, and it offends against one of the strongest reasons of the rule which prohibits trading between enemies, because it strengthens the enemy. If such deeds as that of Asa Tift were valid in law, then in the late rebellion every rebel preparing for that or engaged in it, could have sold his lands in the loyal States, and thus have withdrawn them from the reach of our laws, and secured the proceeds for the aid of the confederacy.
In -the case in Granch, the alien enemy devisee was the party to the action, so that the only point decided was that he took title under the devise, and- the question whether he could convey by deed 'flagrante hello did not arise; and we do not carry its decision beyond the question before the court, though the language of Judge Story might reach further. In arguing the point, he enumerates the rights and disabilities of an alien enemy, and says: “Until the lands are seized, the alien has complete dominion over them, and may convey the same to a purchaser;” and then in the subsequent paragraph says: “We do not find that, in respect to these general rights and disabilities, there is any admitted difference between alien friends and enemies.” Ftoin this it might be argued that an alien enemy, as well as an alien friend;, might convey lands by deed, but the authorities cited by the learned justice do not reach to this, nor did the case present the question, and we think it is not decided by it nor comprehended in it as an exception, to the rule that contracts between enemies are void.
No case has been adduced in which a deed from an enemy in a hostile' country made flagrante hello, has been sustained, and in the theory of the common law it is a legal impossibility, for the king’s enemy cannot enter the king’s territory to give the seizin a freehold estate requires for 'its transfer, and in that theory all lands are held of the king upon some service to him, and to say of such lands that they may/ be held and granted by the king’s enemy involves a contradiction in terms, for it is to say that the king’s enemy is his feudatory.. Butapart from the common law, we think, on general principles, that the enemy of the sovereign cannot of right hold, grant, and exereise dominion/ *36 over lands within the sovereign’s domain, subject to and transferable only by his laws.
And without reference to such considerations, we think and hold that the deed of Asa F. Tift to the petitioners was a contract between enemies prohibited by the laws of war, and that it was therefore utterly void and of no legal effect.
It was argued for the petitioners that if the’ United States might have seized and confiscated this real estate of Asa Tift, they had not done so. This is true, and it is. a fair inference that the United States did not wish to seize and confiscate this real estate, and thus divést the title of Mr. Asa Tift, and secure the property to themselves — such procedure is opposed by the modern mitigation of the laws of war ; but it does not follow that the United States were willing Mr. A. Tift should convert this real estate into money, easily concealed and withdrawn from the reach of the municipal law, and transferable to the territory and aid of the rebels; and the just conclusion is that the United States were willing Mr. A. Tift should keep his land; to be enjoyed and controlled by him when, as a loyal subject, he could return to it, and not before; and this would be the consequence of their forbearance to seize it, and the rule of law that prevents the contracts of enemies, and, therefore, the conveyance claimed here.
So it was contended for the petitioner that no part of the transaction took place within the rebel lines, and this is true, because it was conducted by Charles Tift, as the attorney of A. F. Tift, in Key West, which was in’the possession of the United States; but it was none the less a contract between enemies, and so an offence against the law of nations, and its locality was immaterial whether it was in the rebel lines or ours, or both, and the act of the attorney was the act of the principal; and the letter of attorney was avoided by the same circumstances that avoided the deed of conveyance viz: that AsaTift bad signed and made himself party to the act of secession of the State of Florida, and left the lines held by the United States, and gone into those of the enemy in adherence to them. In speaking of a contract made by an agent between alien enemies, Justice Story thus states the law. (1 Gall., 563 ; “ The Emulous:”) “ It is of no importance what the character of the agent is. The transaction must have the same legal construction as though made by the aliens themselves. Now, admitting that this sale was not colorable, but bona fide, which, however, I am not at present disposed to believe, still it was a contract made with enemies pending a known war, and therefore invalid. No principle of national or municipal law is better settled than that all contracts with *37 an enemy, made during war, are utterly void. This principle lias grown hoary under the reverend respect of centuries.”
If the deed of A. F. Tift to the petitioners was void, the remaining question is: Did this affect the authority of the officers at Key West to make the lease? It is found in the statement of facts that they knew of the circumstances avoiding the deed to the petitioners,'and making their title invalid, and leaving the title to the property in A. F.-Tift, who was still a confederate and an enemy, whose lands were subject, by the laws of war, (if the United States chose to enforce their rigor,) to seizure and confiscation as to their rents and profits, (Wheaton, Lawrence ed., 528, citing Vattel,) and subject, also, while Mr. Tift’s treason continued, to such legislation as the United States might see fit to adopt as to rebels and their property; and we think the officers at Key West were not authorized to alter the status of the property in these respects, and subject the United States, as tenants to a title which was made invalid by circumstances known both to the officers and petitioners, when the lease was made,- and was acquired to the petitioners by the violation of law. .
And we decide as points of law—
1. That the deed from A. F. Tift to the petitioners was void, as a contract between enemies.
2. That the officers of the quartermasters’ department at Key West were not authorized to hire for the United States premises, the title to which was invalid by circumstances known to the officers at the time the lease was made, and that the United States are not parties to the lease, nor liable thereupon.
Nott, J"., concurred in the opinion read by Loring, J., but thought the case should be dismissed for want of jurisdiction, under the provisions of the act to restrict the jurisdiction of the Court of Claims, 4th July, 1864, (13 Stat. L., p. 381.)