SARA E. TECHT, Respondent, *v.* ELIZABETH L. HUGHES, Appellant, Impleaded with Others.

Aliens — rights of aliens whose country is at war with the United States — alien friends — Real Property Law, § 10 — effect of provisions of treaty with Austria upon statutory provision regulating the right of aliens to take or inherit real property in this state — right of American woman married to citizen of Austria residing in this state to inherit real property in this state from father who died after war was declared between this country and Austria.

1. Provisions of a treaty compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected. The part of the courts is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence presumably intended to be limited to times of peace. The mere fact that other portions of the treaty are suspended or even abrogated is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act. Until the political departments have acted, the courts, in refusing to give effect to treaties, should limit their refusal to the needs of the occasion. They are not bound by any rigid formula to nullify the whole or nothing; and in determining whether the treaty of the United States with Austria survived the coming of war, they are free to make choice of the conclusion which shall seem the most in keeping with the traditions of

the law, the policy of the statutes, the dictates of fair dealing, and the honor of the nation.

2. A citizen of the United States, plaintiff's father, died intestate on December 27, 1917, seized in fee simple of real estate in the city of New York. The plaintiff in 1911 became the wife of a resident of the United States, but a citizen of Austria-Hungary. Twenty days before the death of the plaintiff's father, war was declared between Austria-Hungary and the United States. Neither the plaintiff nor her husband has been interned, nor has the loyalty of either been questioned by the government of the state or nation, and both, remaining residents of the United States, have kept the peace and obeyed the laws. The plaintiff's capacity on December 27, 1917, to acquire title by descent is the question to be determined. Congress has enacted that " any American woman who marries a foreigner shall take the nationality of her husband." (Act of March 2, 1907, ch. 2534, 34 Stat. 1229.) Plaintiff is indisputably an alien, and is without capacity to inherit unless statute or treaty has removed the disability.

3. The statute says that " a citizen of the United States is capable of holding real property within this state, and of taking the same by descent, devise or purchase," and that " alien friends are empowered to take, hold, transmit and dispose of real property within this state in the same manner as native born citizens, and their heirs and devisees take in the same manner as citizens." (Real Prop. Law, § 10, as amd. L. 1913, ch. 152; Cons. Laws, ch. 50.) *Held,* that plaintiff, being the subject of a foreign state at war with the United States, was not an alien friend, and hence was not entitled to inherit under the statute and must base her title on the treaty. The authorities on the distinction between alien friends and alien enemies collated.

4. The treaty with Austria says that: " Where, on the death of any person holding real property, or property not personal, within the territories of one party, such real property would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of two years to sell the same; which term may be reasonably prolonged, according to circumstances; and to withdraw the proceeds thereof, without molestation, and exempt from any other charges than those which may be imposed in like cases upon the inhabitants of the country from which such proceeds may be withdrawn." (Art. II of Convention between United States and Austria, concluded May 8, 1848; 9 Stat. 944.) The fee descends under the treaty subject to the condition that it shall be disposed of within the term of two years. There was no breach of this condition since judgment of partition and sale was entered within the term of two years; hence plaintiff has an estate of inheritance if

the treaty is in force, since the treaty is the supreme law of the land and supersedes all local laws inconsistent with its terms. *Held*, that there is nothing incompatible with the policy of the government, with the safety of the nation, or with the maintenance of the war in the enforcement of the treaty so as to sustain the plaintiff's title.

(Argued April 13, 1920; decided June 8, 1920.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 30, 1920, affirming an interlocutory judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term in an action for partition of real property.

The following question was certified: " Has the plaintiff herein an estate of inheritance in the real property sought to be partitioned in this action? "

The facts, so far as material, are stated in the opinion.

*Joseph Day Lee* for appellant. Plaintiff was not on the date of her father's death an alien friend, within the meaning of section 10 of the Real Property Law, and was, therefore, an alien enemy. (*Ex parte Graber*, 247 Fed. Rep. 882; *State* v. *Darwin*, 173 Pac. Rep. 29; 3 Vattil's Law of Nations, ch. 5, p. 321; Hall on Intern. Law [6th ed.], 383; 1 Kent's Comm. 55; 2 Halleck on Intern. Law, 1; *Thurm* v. *Moffit*, L. R., 1915, 1 Ch. 58; *Yeo* v. *Mercereau*, 18 N. J. Eq. 387; *United States* v. *One Hundred Barrels*, 12 Am. L. R. 735; *McCarthy* v. *Marsh*, 5 N. Y. 263; *McGregor* v. *Comstock*, 3 N. Y. 408; *Wadsworth* v. *Wadsworth*, 12 N. Y. 376; 2 Bl. Com. 249; *Jackson* v. *Fitzsimmons*, 10 Wend. 9; *Mick* v. *Mick*, 10 Wend. 379; *Beck* v. *McGillis*, 9 Barb. 35.) The potential right of the defendant, under the treaty of 1848 with Austria-Hungary, to inherit lands in this state, was abrogated by the declaration of war. (*Stewart* v. *Russell*, 91 App. Div. 310; *Orser* v. *Hoag*, 3 Hill 79; Wheaton on Intern. Law [5th ed.], 377; Wilson & Tucker on Intern. Law,

238; Stockton on Intern. Law, 264; Davis' Elements of Law, 239; 1 Kent's Comm. 176.) In enacting section 10 of the Real Property Law, the legislature did not discriminate against citizens in favor of aliens. (*Luhrs* v. *Eimer*, 80 N. Y. 171.) Respondent had no right of inheritance prior to the outbreak of the war. (*Orser* v. *Hoag*, 3 Hill, 79.)

*Joseph Rosenzweig, Samuel Franklin* and *Bernard H. Levy* for respondent. Under section 10 of the Real Property Law, respondent is entitled to take and acquire by inheritance a one-half share of the real estate of which her father, James J. Hanigan, died seized. (*Bank of Metropolis* v. *Faber*, 150 N. Y. 200; *Matter of Hudson Savings Inst.*, 5 Hun, 612; *Miller* v. *McKeon*, 15 App. Div. 133; *Hall* v. *Hall*, 81 N. Y. 130; *Parker* v. *Linden*, 113 N. Y. 28; *Goodrich* v. *Russell*, 42 N. Y. 177.) The respondent did not by marrying an Austrian subject become subject to all the disabilities of alienage, such as inability to inherit the property of her father, and under section 51 of the Domestic Relations Law she had the right to acquire and hold real estate as if she were unmarried. (*Wright* v. *Sadler*, 20 N. Y. 320; *McIlvaine* v. *Kadel*, 3 Robt. 429; *Mygatt* v. *Coe*, 152 N. Y. 457.) On December 27, 1917, the date of James J. Hanigan's demise, there was no Federal statute in force, or proclamation of the president issued, changing the status of Sara E. Techt from alien friend to alien enemy, and it, therefore, follows that her status was that of a friend. (*State* v. *Darwin*, 173 Pac. Rep. 29; *Arndt-Ober* v. *Met. Opera Co.*, 182 App. Div. 513; *Tortoriello* v. *Seghorn*, 103 Atl. Rep. 393; U. S. R. S. §§ 4067, 4068; *Heiler* v. *Goodman's Co.*, 105 Atl. Rep. 233; *Kaunengiesser* v. *Israelowitz*, 107 Misc. Rep. 349; *Porter* v. *Freudenberg*, 1915, 1 K. B. 857; *Janson* v. *Driefontein Cons. Mines*, 1902, A. C. 505.) It it be determined that the respond-

15

ent was an alien enemy, and for that reason unable · to take by inheritance under section 10 of the Real Property Law, then such disability was entirely removed by virtue of the treaty between the United States and Austria, proclaimed February 25, 1850, under the terms of which the respondent, as an Austrian subject, would be entitled to dispose of her share of the real estate left by her father. (*Bollerman* v. *Blake*, 24 Hun, 187; 94 N. Y. 624; *Kull* v. *Kull*, 37 Hun, 476; *Matter of Beck*, 31 N. Y. S. R. 965; *Hauenstein* v. *Lynham*, 100 U. S. 483; *Wunderlee* v. *Wunderlee*, 144 Ill. 40; *Maiden* v. *Ingersoll*, 6 Mich. 373; *People* v. *Gerke*, 5 Cal. 381; *U. S.* v. *Lariviere*, 93 U. S. 198; *Chirac* v. *Chirac*, 15 U. S. 259; *Scharpf* v. *Schmidt*, 172 Ill. 255; *Fischer* v. *Sklenar*, 163 N. W. Rep. 861.)

CARDOZO, J. James J. Hannigan, a citizen of the United States, died intestate on December 27, 1917, seized in fee simple of real estate in the city of New York. Two daughters, the plaintiff, Sara E. Techt, and the defendant, Elizabeth L. Hughes, survived him. In November, 1911, the plaintiff became the wife of Frederick E. Techt, a resident of the United States, but a citizen of Austria-Hungary. On December 7, 1917, twenty days before the death of plaintiff's father, war was declared between Austria-Hungary and the United States. The record contains a concession that neither the plaintiff nor her husband has been interned, nor has the loyalty of either been questioned by the government of state or nation, and that both, remaining residents of the United States, have kept the peace and obeyed the laws. The plaintiff's capacity on December 27, 1917, to acquire title by descent is the question to be determined.

The rule at common law was that aliens might take lands by purchase, and hold until office found, but could take nothing by descent (*Martin* v. *Hunter's Lessee*, 1 Wheat. 304; *Hauenstein* v. *Lynham*, 100 U. S. 483; *Haley* v. *Sheridan*, 190 N. Y. 331; 2 Kent's Comm. 54). " If an

alien could acquire a permanent property in lands, he must owe an allegiance equally permanent with that property to the King of England, which would probably be inconsistent with that which he owes to his own natural liege lord; besides that thereby the realm might in time be subject to foreign influence, and feel many other inconveniences" (1 Blackstone Comm. 372). Blackstone was repeating the explanation which was already traditional in his day. Inheritance by aliens, says Coke (*Calvin's Case*, 4 Co. Rep. 1, 19), would " tend to the destruction of the realm." And if it be demanded " wherein doth that destruction consist," his answer is: " first, it tends to destruction *tempore belli;* for then strangers might fortify themselves in the heart of the realm and be ready to set fire on the commonwealth," for all which he finds example and warning in the legend of the Trojan horse. Artificial and far-fetched may seem to-day this defense of the policy of the rule. We may even doubt whether it is sound in history (1 Pollock & Maitland's History of English Law, 445). That is little to the point. The rule, whatever its origin, is inveterate and undoubted. It survives to-day except as statute or treaty may have abrogated or changed it.

The plaintiff is indisputably an alien. Congress has enacted that " any American woman who marries a foreigner shall take the nationality of her husband " (Act of March 2, 1907, ch. 2534, 34 Stat. 1229). That statute was considered in *Mackenzie* v. *Hare* (239 U. S. 299) where an American-born woman, married to a British subject, and residing in California, was held, by force of her marriage, to have lost the right to vote. (Compare the reciprocal rights of alien women who marry citizens of the United States; U. S. R. S. § 1994; 10 St. L. 604; *Kelly* v. *Owen*, 7 Wall. 496). Marriage to an alien is voluntary expatriation. The plaintiff is in the same position as if letters of naturalization had been issued to her in Austria. She is in the same position

as her husband. She is without capacity to inherit unless statute or treaty has removed the disability.

Both statute and treaty are invoked in her behalf. The statute says that "a citizen of the United States is capable of holding real property within this state, and of taking the same by descent, devise or purchase," and that "alien friends are empowered to take, hold, transmit and dispose of real property within this state in the same manner as native born citizens, and their heirs and devisees take in the same manner as citizens" (Real Prop. Law, sec. 10, as amended by L. 1913, ch. 152; Consol. Laws, chap. 50). Alien enemies, therefore, have such rights and such only as were theirs at common law. The treaty says that "where, on the death of any person holding real property, or property not personal, within the territories of one party, such real property would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of two years to sell the same; which term may be reasonably prolonged, according to circumstances; and to withdraw the proceeds thereof, without molestation, and exempt from any other charges than those which may be imposed in like cases upon the inhabitants of the country from which such proceeds may be withdrawn" (Art. II of Convention between United States and Austria, concluded May 8, 1848, and proclaimed October 25, 1850; 9 Stat. 944, extending the stipulations of the treaty of Commerce and Navigation, concluded August 27, 1829, and proclaimed February 10, 1831, 8 Stat. 398).

Statute and treaty will be separately considered.

(1) If the plaintiff's capacity to inherit depended solely on the statute, I should feel constrained to hold against her. I cannot follow the Appellate Division in its view that she is in law an "alien friend." The wisdom or fairness of the statute, I make no attempt to vindicate.

Our duty is done when we enforce the law as it is written. In the primary meaning of the words, an alien friend is the subject of a foreign state at peace with the United States; an alien enemy is the subject of a foreign state at war with the United States (1 Kent Comm. p. 55; 2 Halleck Int. L. [Rev. 1908] p. 1; Hall Int. Law [7th ed.], p. 403, § 126; Baty & Morgan War: Its Conduct and Legal Results, p. 247; 1 Halsbury Laws of England, p. 310; *Sylvester's Case,* 7 Mod. 150; *The Roumanian,* 1915, Prob. Div. 26; affd., 1916, 1 A. C. 124; *Griswold* v. *Waddington,* 16 Johns. 437, 448; *White* v. *Burnley,* 20 How. [U. S.] 235, 249; *The Benito Estenger,* 176 U. S. 568, 571; *Kershaw* v. *Kelsey,* 100 Mass. 561; so all the lexicographers, as, *e. g.,* Webster, Murray, Abbott, Black, Bouvier). This primary meaning must be taken to be the true one unless evidence is at hand that some other meaning was intended. There are times, indeed, when alien enemies are relieved of disabilities, and treated in the same way or nearly the same way as friends (*Porter* v. *Freudenberg,* 1915, 1 K. B. 857; *Clarke* v. *Morey,* 10 Johns. 69; Hall Int. Law [7th ed.], p. 410; Scrutton The Law and the War, 34 Law Quarterly Rev. 120, 121; McNair Alien Enemy Litigants, 34 id. 134; Picciotto Alien Enemies in English Law, 27 Yale Law Journal, 167, 168; The Right of Alien Enemies to Sue, 27 id. 104, 105; 1 Blackstone Comm. 372, 373). Unless they are present in the hostile territory or are found adhering to the enemy, they retain, by express or implied license of the sovereign, many of the privileges that belong to them in peace. Sometimes, though loosely, we speak of them as friends for the purpose of characterizing their status when they are brought within the range of exemption, tacit or proclaimed. The truth is that they are enemies, who, within the limits placed by the sovereign upon a revocable license, enjoy the privileges of friends. Their identification with friends is never complete (Baty & Morgan " War: Its Conduct and Legal Results,"

p. 252). They are subject to one restriction or another betokening their enemy character. No doubt there is a growing tendency to narrow the field of disability. The day may come when the movement will have spread so far that the subject of a hostile power residing within our territory and yielding obedience to our laws will be ranked as a friend, not for some purposes, but for all. But in construing a statute we assume that the legislature has spoken in the light of the law as it is, and not as it may hereafter be. The law as declared in New York when this statute was enacted, held fast to the old moorings. Its history, briefly followed, may make the solution of the problem clearer.

In the beginnings of English law, the bodies of alien enemies found within the realm were seized and their goods were forfeit to the crown (Pollock & Maitland History of Eng. Law, *supra;* Hall Int. Law, 461, 462; 2 Westlake Int. Law, p. 44; *East India Co.* v. *Sandys,* 1684, 10 State Tr. at p. 487). The first relaxation was in favor of the merchant class (2 Westlake Int. L. p. 44). We read in Magna Charta that " if in time of war merchants of the country at war with us shall be found in our country at the outbreak of the war, they shall be attached without damage to their bodies, or their goods, until it is known to us or to our chief justice how merchants of our country who are then found in the country at war with us are treated; and if ours are safe there, the others shall be safe in our country " (2 Westlake, *supra.* Cf. the Statute of Staples, 27 Edw. III, 1354; also 2 Holdsworth's History of English Law, p. 393). From foreign merchants, protection spread to others. They were still enemies, however, and were far from remaining in the realm on terms of equality with friends. Coke, writing in 1608 (*Calvin's Case, supra*), tells us that an alien friend may acquire goods personal as an Englishman, and may maintain an action for the same. " But if this alien become an enemy (as all alien friends may), then he is

utterly disabled to maintain any action, or get anything within this realm. And this is to be understood of a temporary alien, that being an enemy may be a friend, or becoming a friend, may be an enemy " (*Calvin's Case*, 4 Co. Rep. 1). In time the courts held that alien enemies, if permitted to remain within the realm, might sue in English courts (*Wells* v. *Williams*, 1697, 1 Ld. Raymond, 282). They were within the protection of the King's license, either tacit or express (*Wells* v. *Williams, supra; Daubigny* v. *Davallon*, 1794, 2 Anst. 462; *Porter* v. *Freudenberg*, 1915, 1 K. B. 857, 968). " TREBY, Chief Justice, said that wars at this day are not so implacable as heretofore, and therefore an alien enemy, who is here in protection, may sue his bond or contract; but an alien enemy abiding in his own country cannot sue here " (*Wells* v. *Williams, supra*). So the law has since remained for aliens within the realm (*Porter* v. *Freudenberg, supra; Princess Thurn* v. *Moffitt*, L. R. 1915, 1 Ch. 58; *Matter of Stahlwerk B. A. Patent*, L. R. 1917, 2 Ch. 272). Even so, they were enemies, and not to be confused with friends. A prisoner of war might sue, though assuredly an enemy (HEATH, J., in *Sparenburgh* v. *Bannatyne*, 1 Bos. & Pull. 163, 171; *Clarke* v. *Morey, supra*). So might an interned alien under the English statute (*Schaffenius* v. *Goldberg*, 1916, 1 K. B. 284), though we express no opinion whether he has a like right under ours (Cf. *Birge-Forbes Co.* v. *Heye*, 251 U. S. 317, 319). The concession of these privileges to enemies resident within the realm neither transformed them into friends, nor put the two classes on a parity. That is true of enemies in our day as of enemies in the past. Their presence is permitted " subject to various arbitrary regulations " (Baty & Morgan, War: Its Conduct and Legal Results, p. 252). They have no " general license " to live on the same footing as Englishmen and friends (Ibid).

A like development has taken place in the United States. Kent, writing in 1813, held that alien enemies,

if permitted to remain in the. United States, could maintain actions in our courts (*Clarke* v. *Morey*, 10 Johns. 69). That they were enemies, he did not doubt (See pp. 70, 71; also Commentaries, vol. 1, p. 55). A few years later, in *Griswold* v. *Waddington* (16 Johns. 438) he makes his position plain. He will have none of the new doctrine, inspired by the teachings of Rousseau (Hall Int. Law [7th ed.], p. 66; 2 Westlake Int. Law, p. 40), that war is a relation solely between bodies politic, and not between individuals. He holds that " a war on the part of the government, is a war on the part of all the individuals of which that government is composed " (P. 448, citing Vattel, Grotius and Burlamaqui). Other courts took the same ground: " Every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country " (*The Rapid*, 8 Cranch, 155; *White* v. *Burnley, supra; Cooke* v. *U. S.*, 2 Wall. 218; *Lamar* v. *Browne*, 92 U. S. 187). It is not a question of personal sentiments or friendship (*The Benito Estenger*, 176 U. S. 568, 571). It is a question of the allegiance due from the subject to the sovereign. I do not stop to inquire whether international law should put aside this conception of war as involving a relation between individuals, and substitute Rousseau's conception of a relation solely between states (Hall, *supra*, p. 66). The legislature of New York cannot have supposed, when it passed this statute in 1913, that the change had yet been made. The words alien friend and alien enemy had come down through the centuries, freighted with a significance which they had gained under the old order. The plaintiff has the burden of showing that, as used in this statute, they were filled with a new content.

I think the content is unchanged. At the threshold is met the evidence supplied by kindred legislation. This statute is one of a type. Throughout the type, the phraseology varies. The thought back of it is

constant. In New York the first statute regulating the rights of aliens in respect of lands was passed in 1798 (L. 1798, chap. 72). Its language is that " all and every conveyance or conveyances hereafter to be made or executed to any alien or aliens, not being the subject of some foreign state or power which is or shall be at the time of such conveyance at war with the United States of America, shall be deemed valid to vest the estate thereby granted in such alien or aliens " (Cf. L. 1819, ch. 25). In other states, we find a like restriction. New Jersey says that it shall be lawful for " any alien, not being the subject of any state or power which shall be at war with the United States " to take by purchase and descent (1 N. J. Comp. St. p. 39). Georgia gives a like right to " aliens, the subjects of governments at peace with the United States " (Ga. Code, § 2173). Maryland, Kentucky and West Virginia speak of " aliens not enemies " (Md., Bagby's Code, art. 3, § 1; Ky. [Carroll] 1915, §§ 334, 337; W. Va., Hoff's Code, 1913, §§ 3737, 3738). I am persuaded that these statutes, whatever the differences of phraseology (*Davis* v. *Davis*, 75 N. Y. 221), reveal the same policy, and mean the same thing.

Acts of Congress having relation to different but kindred topics help to fix the meaning. Section 2171 of the United States Revised Statutes declares in substance that " alien enemies " shall not be naturalized (see also 40 U. S. Stat. [1918] ch. 60). The courts have applied the prohibition to citizens of Austria-Hungary (*Ex parte Graber*, 247 Fed. Rep. 882; *Ex parte Blazekovie*, 248 Fed. Rep. 327). Another act of Congress declares that all male citizens or male persons " not alien enemies " who have declared their intention to become citizens between the ages of 21 and 30, shall be subject to the draft (40 U. S. Stat. [1918] ch. 143, chap. XII, § 4). Other legislative bodies use the same words with the same meaning. Texas and Connecticut have passed laws that " alien enemies " must register (Texas Gen. L. 1918,

p. 202; Conn. Public Acts, 1917, p. 2503). Great Britain in the Alien Restriction Order (part III, sec. 28), issued under the authority of the British Alien Restriction Act of 1914, has said that " the expression ' alien friend ' means an alien whose sovereign or state is at peace with his Majesty, and the expression alien enemy means an alien whose sovereign or state is at war with his Majesty."

I find nothing that overbears the cumulative force of all this statutory definition either in the President's proclamation of December 11, 1917, issued under the authority of section 4067 of the United States Revised Statutes, or in the act of October 6, 1917 (40 U. S. Stat. p. 411, ch. 106) " to define, regulate and punish trading with the enemy."

Section 4067 of the United States Revised Statutes as in force in December, 1917, provided that in case of war, all " subjects of the hostile nation or government, being males of the age of fourteen years and upward, who shall be within the United States, and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed, as alien enemies," and " the President is authorized, in any such event, by his proclamation thereof, or other public act to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject, and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety."

An amendment of the statute in April, 1918, extended its scope to women (40 Stat. ch. 55, p. 531). On April 6, 1917, at the outbreak of the war with Germany, and again on November 16, 1917, the President issued proclamations regulating the conduct of German subjects resident in

the United States (40 Stat. pp. 1650, 1716). On December 11, 1917, he issued a proclamation regulating the conduct of subjects of Austria-Hungary resident in the United States (40 Stat. p. 1729). After the amendment of section 4067 in April, 1918, a supplemental proclamation of May 31, 1918, brought women within the scope of the regulations then applicable to men (40 Stat. 1786). The restrictions laid upon German subjects, remaining in the United States were many and minute. They were subject to summary arrest and internment by order of the President. They could not possess firearms or explosives. They could not approach forts, or arsenals, or munition factories. They could not depart from the United States without the permit of the President or the order of a court. They were excluded from the District of Columbia. They could not enter railroad depots, yards, or terminals without license. They were commanded to register, and their presence in the United States, its territories and possessions, became unlawful without registration cards upon their persons. Restrictions imposed upon the subjects of Austria-Hungary were fewer and less burdensome, yet the proclamations did not leave them on an equality with friends. They were not at liberty to depart from the United States without permit of the President or the order of a court. They could not land in or enter the United States except under such restrictions and at such places as the President might prescribe. They were subject to summary arrest and internment whenever there was reasonable cause for the belief that their presence at large was a menace to the peace and safety of the country. No doubt they retained many of the privileges that had been theirs in times of peace. That was true of Germans also. The courts were open to them. Keeping within the law, they might live their lives and pursue their callings unmolested. Overnight, however, a proclamation of the President might subject them to new burdens. The great immuni-

ties of the Constitution were not theirs in undiminished force (*DeLacey* v. *U. S.*, 249 Fed. Rep. 625; *Ex parte Franklin*, 253 id. 984; *Galamandra Ins. Co.* v. *N. Y. Life Ins. & Trust Co.*, 254 id. 852. Cf. Blackstone Comm. 372). What others did confidently and of right, they did by sufferance and doubtfully, uncertain of the restrictions of the morrow. They were alien enemies, treated with liberality, but watched with a suspicious eye as enemies, and never identified with friends.

The Trading with the Enemy Act (40 Stat. ch. 106, p. 411) did not invest them with a different status. Its definition of an enemy was " for the purposes of such trading and of this act," and for no other. Trade was prohibited with any one resident within the hostile · territory, even though a citizen of the United States, and with such other persons, wherever resident, if subjects of the hostile nation, as might be brought within the term enemy by proclamation of the President. The prohibition in its main features is in line with the restrictions which would have been imposed in default of any statute. But the disability of aliens in respect of the ownership of lands has no connection with their disabilities in respect of the privileges of trade (*Kershaw* v. *Kelsey*, 100 Mass. 561, at p. 574, 575; *Fairfax* v. *Hunter's Lessee*, 7 Cranch, 603, 620; *London & Northern Estates Co.* v. *Schlesinger*, 1916, 1 K. B. 20). If the state of New York had declared that all aliens should have capacity to acquire ownership by descent, neither the Trading with the Enemy Act, nor any rule of the common law, would read into the statute an implied exception in the contingency of war, and withhold the right of succession from alien enemies, whether resident in hostile territory or here (*Kershaw* v. *Kelsey*; *Fairfax* v. *Hunter, supra*). The nation by act of Congress might declare their lands forfeit (*Brown* v. *U. S.*, 8 Cranch, 110; *Mrs. Alexander's Cotton*, 2 Wall. 404; *Miller* v. *U. S.*, 11 Wall. 268), but in the absence of such a forfeiture title would be theirs. To argue, that alien enemies, resident in

the United States, may inherit because they may trade is to assume that disabilities must have identity of duration though they have diversity of origin.

Trade in aid of the enemy's resources, since it tends to prolong the combat, is illegal for every one within our jurisdiction, whether enemy or friend (*The Hoop*, 1 Rob. Adm. 196; *Griswold* v. *Waddington, supra; Porter* v. *Freudenberg, supra; Kershaw* v. *Kelsey, supra;* 2 Westlake Int. L. 51). The prohibition does not run against the alien as an incident of the disabilities of alienage. It runs against citizen and alien as an incident of the necessities of war. The sovereign will not permit its military operations to be hampered by those whom it controls. Much of the obscurity which surrounds the rights of aliens has its origin in this confusion of diverse subjects. Disabilities are confounded with prohibitions; the incidents of alienage with incidents that are common to alienage and citizenship. Sometimes we are told in loose and sweeping terms that there may be no trade with alien enemies. The statement is inaccurate (27 Yale Law Journal, 105), for commercial domicile, and not alienage, determines the enemy character of commerce (Hall, *supra,* at p. 526, and cases there cited). Then, to supply the needed correction, a new definition of alien enemies is put forward for the purpose of the rule, and finally what is a definition for one purpose is erroneously assumed to be a definition for all others. The truth is that the right to trade, since it does not follow lines of citizenship, should not be formulated in terms of alienage. If a citizen of the United States does business in a hostile territory, trade is prohibited with him as much as with an alien (*The Peterhoff,* 5 Wall. 28). To bring him within the compass of a rule imperfectly stated at the outset, he is sometimes characterized by courts as an alien enemy himself (*Porter* v. *Freudenberg, supra*). In reality, of course, he is not an alien, either enemy or friend. What is meant is that trade with him is as unlawful as if he

were an alien enemy. But plainly the statute of New York does not speak of alien friends in this special and unnatural sense. There was no thought of taking from our own citizens the right of purchase and inheritance when resident in hostile lands. The definition of enemies for the purpose of trade is thus in some features too wide and in others too narrow when fitted to this statute. It is too wide in that it includes citizens as well as aliens abroad. It is too narrow in that it excludes the alien at home.

General statements in such cases as *Porter* v. *Freudenberg* (1915, 1 K. B. 857), that the test of an alien enemy is not his nationality, but the place in which he resides or carries on business, are for the same reason misleading and erroneous if dislocated from their setting. Read in the light of the context, they become consistent and intelligible (See pp. 869, 873). "What did that case (*Porter* v. *Freudenberg*) decide? It decided that for the purpose of trading, it is not a person's nationality that determines whether he is an alien enemy" (*Schaffenius* v. *Goldberg*, 1916, 1 K. B. 284, 299). Subjects of a belligerent power are thus classified for a particular purpose as no longer alien enemies, when all that is meant is that they are relieved to that extent and for that purpose of the disabilities of enemies. The German-born subject, resident within the British realm, who found himself interned in a war camp, though with the right to trade and sue, was probably under no delusion that he was in law an alien friend (*Ex parte Weber*, 1916, 1 A. C. 421).

Other cases much relied on by the plaintiff, along with *Porter* v. *Freudenberg* (*supra*), are plainly beside the point. *Princess Thurn* v. *Moffitt* (L. R. 1915, 1 Ch. 58) involved a question of the right to sue. The suitor was a British-born woman, resident in England, the wife of a German. Her right to sue was upheld, but her status as an alien enemy was assumed. *Tortoriello* v. *Leghorn* (103 Atl. Rep. 393 [Mar. 12, 1918], N. J. Ch.) involved

a question of the right to trade. An alien enemy who owned land in New Jersey before the war agreed to sell it after the war. The point decided was that the Enemy Trading Act did not prohibit him from carrying out his contract. *State* v. *Darwin* (Wash. [May 10, 1918], 173 Pac. Rep. 29) involved the same statute.

The case under the statute of New York comes down, then, to this: The question, " What are the rights of alien enemies in the absence of statutory restrictions? " is distinct from the question, " Who are alien enemies within the scope of such restrictions? " Alien enemies, resident within our borders, retain by implied license many of the civil rights of friends. Implication ceases, however, to be legitimate when an express and conflicting prohibition occupies the field. *Expressum facit cessare tacitum.* The civil rights which belong to alien enemies by implied license of the Federal government do not include the right to purchase or inherit land. That is a subject which every state, in the absence of inconsistent treaty, may regulate for itself (*Blythe* v. *Hinckley,* 180 U. S. 333, 341). The civil rights which belong to alien enemies by implied license of the states, do not include in New York the right to purchase and inherit land, for the field is occupied by statute, and there is, therefore, nothing to be implied. The legislature might have refused to draw a distinction between enemies and friends. It might have given capacity to all aliens alike, and in that event capacity would not have ended with the outbreak of the war. It chose a policy less liberal. It gave the privilege to friends and withheld the privilege from enemies. I find no ground for the belief that it intended the definition of enemies to wait upon the varying terms of proclamations of future presidents, to be enlarged to-day, and restricted to-morrow, with the changing fortunes of a war. For the same reason, I cannot think that there was willingness to impair the security of titles by substituting the uncertain and fluid

test of loyalty in act and speech for the certain and historic test of allegiance to the sovereign. In the law of land, more than in any other branch of law, words are used as terms of art. Here, more than in any other field, the method of history supplies the organon of interpretation for the work of legislators and judges. Deep into the soil go the roots of the words in which the rights of the owners of the soil find expression in the law. We do not readily uproot the growths of centuries.

(2) The support of the statute failing, there remains the question of the treaty. The treaty, if in force, is the supreme law of the land (U. S. Const. art. 6) and supersedes all local laws inconsistent with its terms (*Hauenstein* v. *Lynham*, 100 U. S. 483; *Geofroy* v. *Riggs*, 133 U. S. 258; *Chirac* v. *Chirac*, 2 Wheat. 259; *Kull* v. *Kull*, 37 Hun, 476). Judicial construction has already fixed its meaning (*Kull* v. *Kull*, supra; *Bollermann* v. *Blake*, 24 Hun, 187; 94 N. Y. 624; *Stamm* v. *Bostwick*, 40 Hun, 35, 37; *Hauenstein* v. *Lynham*, supra; *Scharpf* v. *Schmidt*, 172 Ill. 255; *Wunderle* v. *Wunderle*, 144 Ill. 40; *Fischer* v. *Sklenar*, 101 Neb. 553). The right which it secures is in form a right of sale. In substance, it is a right of ownership. The fee descends subject to the condition that it shall be disposed of within the " term of two years, which term may be reasonably prolonged according to circumstances " (*Kull* v. *Kull*, supra). We do not need to determine the effect of a breach of the condition. In this instance there was none. Judgment of partition and sale was entered within the term of two years. The plaintiff has an estate of inheritance if the treaty is in force (*Scharpf* v. *Schmidt*, supra; *Kull* v. *Kull*, supra).

The effect of war upon the existing treaties of belligerents is one of the unsettled problems of the law. The older writers sometimes said that treaties ended *ipso facto* when war came (3 Phillimore Int. L. 794). The writers of our own time reject these sweeping statements (2 Oppenheim Int. L. sec. 99; Hall Int. L. 398, 401;

Fiore, Int. L. [Borchard's Transl.] sec. 845). International law to-day does not preserve treaties or annul them regardless of the effects produced. It deals with such problems pragmatically, preserving or annulling as the necessities of war exact. It establishes standards, but it does not fetter itself with rules. When it attempts to do more, it finds that there is neither unanimity of opinion nor uniformity of practice. " The whole question remains as yet unsettled " (Oppenheim, *supra*). This does not mean, of course, that there are not some classes of treaties about which there is general agreement. Treaties of alliance fall. Treaties of boundary or cession, " dispositive " or " transitory " conventions, survive (Hall Int. L. pp. 398, 401; Westlake Int. L. II, 34; Oppenheim, *supra*). So, of course, do treaties which regulate the conduct of hostilities (Hall, *supra*; 5 Moore Dig. Int. L. 372; *Society for Propogation of the Gospel* v. *Town of New Haven*, 8 Wheat. 464, 494). Intention in such circumstances is clear. These instances do not represent distinct and final principles. They are illustrations of the same principle. They are applications of a standard. When I ask what that principle or standard is, and endeavor to extract it from the long chapters in the books, I get this, and nothing more, that provisions compatible with a state of hostilities, unless expressly terminated, will be enforced, and those incompatible rejected. ,"Treaties lose their efficacy in war only if their execution is incompatible with war. *Les traités ne perdent leur efficacité en temps. de guerre que si leur exécution est incompatible avec la guerre elle-même* " (Bluntschli, Droit International Codifié, sec. 538.) That in substance was Kent's view, here as often in advance of the thought of his day. "All those duties of which the exercise is not necessarily suspended by the war, subsist in their full force. The obligation of keeping faith is so far from ceasing in time of war, that its efficacy becomes

16

increased, from the increased necessity of it" (1 Kent Comm. p. 176). That, also, more recently, is the conclusion embodied by the Institute of International Law in the rules voted at Christiania in 1912 which defined the effects of war on International Conventions. In these rules, some classes of treaties are dealt with specially and apart. Treaties of alliance, those which establish a protectorate or a sphere of influence, and generally treaties of a political nature, are, it is said, dissolved. Dissolved, too, are treaties which have relation to the cause of war. But the general principle is declared that treaties which it is reasonably practicable to execute after the outbreak of hostilities, must be observed then as in the past. The belligerents are at liberty to disregard them only to the extent and for the time required by the necessities of war. "*Les traités restés en vigueur et dont l'exécution demeure, malgré les hostilités, pratiquement possible, doivent être observés comme par le passé. Les Etats belligérants ne peuvent s'en dispenser que dans la mesure et pour le temps commandés par les necessités de la guerre*" (Institut de droit international, annuaire 1912, p. 648; Scott Resolutions of the Institute of Int. Law, p. 172. Cf. Hall Int. Law [7th ed.], 399; 2 Westlake Int. L. p. 35; 2 Oppenheim Int. L. sec. 99, 276).

This, I think, is the principle which must guide the judicial department of the government when called upon to determine during the progress of a war whether a treaty shall be observed in the absence of some declaration by the political departments of the government that it has been suspended or annulled. A treaty has a twofold aspect. In its primary operation, it is a compact between independent states. In its secondary operation, it is a source of private rights for individuals within states (*Head Money Cases,* 112 U. S. 580, 598). Granting that the termination of the compact involves the termination of the rights, it does not follow because there is a privilege to rescind that the privilege has been exercised. The

question is not what states *may* do after war has supervened, and this without breach of their duty as members of the society of nations. The question is what courts are to presume that they have done. " Where the department authorized to annul a voidable treaty shall deem it most conducive to the national interest that it should longer continue to be obeyed and observed, no right can be incident to the judiciary to declare it void in a single instance " (JAY, Ch. J., in *Jones* v. *Walker*, 2 Paine, 688, 701. Cf. The Legal Nature of Treaties, vol. 10, American Journal of Int. Law [1916], pp. 721, 722). President and senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts (*Fong Yue Ting* v. *U. S.*, 149 U. S. 698). The treaty of peace itself may set up new relations, and terminate earlier compacts either tacitly or expressly. The proposed treaties with Germany and Austria give the victorious powers the privilege of choosing the treaties which are to be kept in force or abrogated. But until some one of these things is done, until some one of these events occurs, while war is still flagrant, and the will of the political departments of the government unrevealed, the courts, as I view their function, play a humbler and more cautious part. It is not for them to denounce treaties generally, *en bloc*. Their part it is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence presumably intended to be limited to times of peace. The mere fact that other portions of the treaty are suspended or even abrogated is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act. "*Le traité tombe pour le tout quand il présente le caractère d'un acte indivisible* " (Rules of the Institute of Int. L.

*supra).* To determine whether it has this character, it is not enough to consider its name or label. No general formula suffices. We must consult in each case the nature and purpose of the specific articles involved. "*Il faut* * * * *examiner dans chaque cas, si la guerre constitue par sa nature même un obstacle a l'exécution du traité*" (Bluntschli, *supra).*

I find nothing incompatible with the policy of the government, with the safety of the nation, or with the maintenance of the war in the enforcement of this treaty so as to sustain the plaintiff's title. We do not confiscate the lands or goods of the stranger within our gates. If we permit him to remain, he is free during good behavior to buy property and sell it (Trading with Enemy Act of Oct. 6, 1917; 40 St. 411, ch. 106). He is to be "undisturbed in the peaceful pursuit" of his life and occupation, and "accorded the consideration due to all peaceful and law-abiding persons" (President's Proclamation of Dec. 11, 1917). If we require him to depart, we assure to him, for the recovery, disposal and removal of his goods and effects and for his departure, the full time stipulated by any treaty then in force between the United States and the hostile nation of which he is a subject; and where no such treaty is in force, such time as may be declared by the President to be consistent with the public safety and the dictates of humanity and national hospitality (U. S. R. .S. sec. 4068, re-enacting the act of July 6, 1798). A public policy not outraged by purchase will not be outraged by inheritance. The plaintiff is a resident; but even if she were a non-resident, and were within the hostile territory, the policy of the nation would not divest her of the title whether acquired before the war or later. Custody would then be assumed by the alien property custodian. The proceeds of the property, in the event of sale, would be kept within the jurisdiction. Title, however, would be unchanged, in default of the later exercise by Congress of the power of confiscation (40 Stat. ch. 106, pp. 416, 424),

now seldom brought into play in the practice of enlightened nations (2 Westlake Int. L. 46, 47; *Brown* v. *U. S.*, 8 Cranch, 110). Since the argument of this appeal, Congress has already directed, in advance of any treaty of peace, that property in the hands of the custodian shall be returned in certain classes of cases to its owners, and in particular where the owner is a woman who at the time of her marriage was a native-born citizen of the United States and prior to April 6, 1917, intermarried with a subject or citizen of Germany or Austria-Hungary (Act of June 5, 1920, amending sec. 9 of the act of Oct. 6, 1917). It follows that even in its application to aliens in hostile territory, the maintenance of this treaty is in harmony with the nation's policy and consistent with the nation's welfare. To the extent that there is conflict between the treaty and the statute (40 Stat. ch. 106), we have the same situation that arises whenever there is an implied repeal of one law by another. To the extent that they are in harmony, both are still in force. There is in truth no conflict here except in points of detail. In fundamental principle and purpose, the treaty remains untouched by later legislation. In keeping it alive, we uphold the policy of the nation, revealed in acts of Congress and proclamations of the President, " to conduct ourselves as belligerents in a high spirit of right and fairness " (President Wilson's Address to the Congress, April 2, 1917; Scott Diplomatic Correspondence between United States and Germany, p. 324), without hatred of race and without taint of self-seeking.

I do not overlook the statements which may be found here and there in the works of authors of distinction (Hall, *supra;* Halleck Int. L. [4th ed.] 314; Wheaton Int. L. [5th ed.] 377) that treaties of commerce and navigation are to be ranked in the class of treaties which war abrogates or at least suspends. Commerce is friendly intercourse. Friendly intercourse between nations is impossible in war. Therefore, treaties regulating such inter-

course are not operative in war. But stipulations do not touch commerce because they happen to be embodied in a treaty which is styled one to regulate or encourage commerce. We must be on our guard against being misled by labels. Bluntschli's warning, already quoted, reminds us that the nature and not the name of covenants determines whether they shall be disregarded or observed. There is a line of division, fundamental in importance, which separates stipulations touching commerce *between* nations from those touching the tenure of land *within* the territories of nations (Cf. The Convention " as to tenure and disposition of real and personal property " between the U. S. & Great Britain dated March 2, 1899). Restrictions upon ownership of land by aliens have a history all their own, unrelated altogether to restrictions upon trade (*Kershaw* v. *Kelsey, supra; Fairfax* v. *Hunter, supra*). When removed, they cease to exist for enemies as well as friends, unless the statute removing them enforces a distinction (*Kershaw* v. *Kelsey, Fairfax* v. *Hunter, supra*). More than that, the removal, when effected by treaty, gives reciprocal privileges to the subjects of each state, and is thus of value to one side as much as to the other. For this reason, the inference is a strong one, as was pointed out by the Master of the Rolls in *Sutton* v. *Sutton* (1 Russ. & M. 664, 675) that the privileges, unless expressly revoked, are intended to endure (Cf. 2 Westlake, p. 33; also Halleck Int. L., *supra*). There, as in *Society for the Propagation of the Gospel* v. *Town of New Haven* (8 Wheat. 464, 494), the treaty of 1794 between the United States and England protecting the citizens of each in the enjoyment of their landed property, was held not to have been abrogated by the war of 1812. Undoubtedly there is a distinction between those cases and this in that there the rights had become vested before the outbreak of the war. None the less, alike in reasoning and in conclusion, they have their value and significance. If stipulations governing the tenure of land

survive the stress of war though contained in a treaty which is described as one of amity, it is not perceived why they may not also survive though contained in a treaty which is described as of one commerce. In preserving the right of inheritance for citizens of Austria when the land inherited is here, we preserve the same right for our citizens when the land inherited is there (*Brown* v. *U. S.*, 8 Cranch, 110, 129). Congress has not yet commanded us, and the exigencies of war, as I view them, do not constrain us, to throw these benefits away.

No one can study the vague and wavering statements of treatise and decision in this field of international law with any feeling of assurance at the end that he has chosen the right path. One looks in vain either for uniformity of doctrine or for scientific accuracy of exposition. There are wise cautions for the statesman. There are few precepts for the judge. All the more, in this uncertainty, I am impelled to the belief that until the political departments have acted, the courts, in refusing to give effect to treaties, should limit their refusal to the needs of the occasion; that they are not bound by any rigid formula to nullify the whole or nothing; and that in determining whether this treaty survived the coming of war, they are free to make choice of the conclusion which shall seem the most in keeping with the traditions of the law, the policy of the statutes, the dictates of fair dealing, and the honor of the nation.

The judgment should be affirmed with costs, and the question certified answered in the affirmative.

HISCOCK, Ch. J., CHASE, HOGAN, McLAUGHLIN and CRANE, JJ., concur; ELKUS, J., concurs in result.

Judgment affirmed.