Rockingham, Feb. 3, 1948. } No. 3687.

### Hanafin & a. v. McCarthy & a.

*Varney* and *Fuller* (*Robert J. Winton, Jr.* orally), for the plaintiffs.

*Charles J. Griffin* (by brief and orally), for the defendants.

Duncan, J. At common law, aliens were incapable of taking real estate by descent; but by statute, the right may be conferred. *Montgomery* v. *Dorion*, 7 N. H. 475. Our statute provides: "An alien resident in this state may take, purchase, hold, convey or devise real estate; and it may descend in the same manner as if he were a citizen." R. L., c. 259, s. 19. Obviously the plaintiffs cannot claim a right

to "take" under the first clause of the statute, since they are non-residents. The case is to be distinguished from that of *Lumb* v. *Jenkins*, 100 Mass. 527, where no requirement of residence within the state was imposed by the statute under consideration. Phraseology similar to that of the last clause of our statute has been held not to authorize transmission of real estate from one alien to another. *Parish* v. *Ward*, 28 Barb. (N. Y.) 328. And in *Donaldson* v. *State*, (Ind.) 67 N. E. 1029, it was pointed out that where both ancestor and descendant are aliens, the statute must confer upon the former capacity to transmit by descent, and upon the latter the power to take by descent, before there can be transmission of title from one to the other. See also, 3 C. J. S. 585, *s*. 26 (b).

Our statute is not capable of construction which would permit a non-resident alien to "take . . . real estate." It does not appear that the decedent was an alien, and we are therefore not called upon to decide whether the provision that real estate held by a resident alien "may descend in the manner as if he were a citizen" could operate to confer upon a non-resident alien heir the right to inherit from a resident alien, although the doubt that it was intended to do so is manifest.

Since the statute does not permit the plaintiffs to take any interest in the real estate in this jurisdiction, it becomes necessary to consider the effect of the treaty upon which the plaintiffs rely, between the United States and the United Kingdom of Great Britain and Ireland, entered into on March 2, 1899.

The Convention relating to the tenure and disposition of real and personal property, concluded on March 2, 1899 between the United States of America and Her Majesty the Queen of the United Kingdom of Great Britain and Ireland, was thereafter duly ratified and made effective. 31 U. S. Stat. 1939. Article I of the Convention provides in part as follows: "Where, on the death of any person holding real property . . . within the territories of one of the Contracting Parties, such real property would, by the laws of the land, pass to a citizen or subject of the other, were he not disqualified by the laws of the country where such real property is situated, such citizen or subject shall be allowed a term of three years in which to sell the same . . . ."

While by article IV, provision was made for adhesion to the Convention, upon notice, by colonies and foreign possessions of Her Britannic Majesty, and territories beyond the seas governed by the United States, no serious doubt appears concerning the binding effect of the treaty upon Ireland as a part of the United Kingdom,

one of the original contracting parties. 40 Geo. 3, *c.* 67, *art.* 6; 42 L. R. Stats. L. 648, 654, (1800). See, *Bamforth* v. *Ihmsen*, 28 Wyo. 282. As to the parties, the provisions of article IV of the treaty were plainly inapplicable.

Since the signing of the treaty, the Free State of Ireland, now Eire, has been created out of Ireland, by Articles of Agreement dated December 6, 1921, and given the force of law by act of the Imperial Parliament. 12 Geo. 5, *c.* 4; 60 L. R. Stats. 4, (1922). By these Articles, the Irish Free State took the "same constitutional status in the community of Nations known as the British Empire, as the Dominion of Canada," and other dominions (Schedule, *par.* 1), and its position in relation to the Imperial Parliament and Government was established as equivalent to that of Canada. *Id., par.* 2. In 1922, the Irish Free State (Constitution) Act was adopted, by which the executive authority of the Free State was vested in the King, exercisable by the representative of the Crown. 13 Geo. 5, *c.* 1, First Schedule, *Art.* 51; 60 L. R. Stats. 635, 649, (1922).

In neither of these acts was the status of existing treaties expressly adverted to. While in practice since 1922, many treaties binding upon the Irish Free State have been concluded in the name of the Government of Ireland, the practice of His Majesty's serving as contracting party in respect of Ireland still survives. See, 32 Am. Jour. Int. L., 467, 480, *et seq.* In *Murray* v. *Parkes*, [1942] 2 K. B. 123, the view was expressed that the status of Ireland as a member of the British Commonwealth of Nations has remained unchanged since the Acts of Parliament of 1921 and 1922, although the parliamentary powers of the Free State were broadened by the Statute of Westminster. (22 Geo. 5, *c.* 4.) See also, "The Status of the Irish Free State." 22 Can. Bar. Rev. 183.

The defendants have called to our attention no action on the part of the Irish Free State, or Eire, which would indicate repudiation by that government of the treaty of 1899. By statute, it has been provided that aliens may take, acquire, hold, and dispose of real property in that country, in the same manner as citizens. Aliens Act, 1935 of Ireland, (No. 14 of 1935). Of the binding effect of a treaty upon a state succeeding to one of the party states, it has been said: "It is evident that on the creation of a new state, by a division of territory, that new state has a sovereign right to enter into new treaties and engagements with other nations, but until it actually does, the treaties by which it was bound as a part of the whole state will remain binding on the new state and its subjects." Crandall,

Treaties, Their Making and Enforcement, (2d *ed.*) 437; Moore, Int. Arb., III, 3321, 3223. Generally speaking, it is recognized that "a state formed by separation one from another . . . succeeds to such treaty burdens of the parent state as are permanent and attached to the territory embraced in the new state." Crandall, *supra*, 434, and authorities cited.

As was pointed out by Mr. Justice *Cardozo* speaking for the court, in *Techt* v. *Hughes*, 229 N. Y. 222, 243, 246, 247, *cert. den.*, 254 U. S. 643, the problem is more political than judicial, and because of the reciprocal nature of privileges relating to ownership of lands, "the inference is a strong one . . . that the privileges, unless expressly revoked, are intended to endure." Holding that treaty provisions were not abrogated by war between the parties, the opinion comments that "until the political departments have acted, the courts, in refusing to give effect to treaties, should limit their refusals to the needs of the occasion" and in determining whether a treaty survives, reach their conclusions in the light of such broad consideration as "the dictates of fair dealing, and the honor of the nation." See also, Uren: The Succession of the Irish Free State, 28 Mich. L. Rev. 149; 48 C. J. S. 20, *s.* 15.

Applicability of the view that the obligations of a sovereignty are binding upon its successor is supported by the exchange of notes in 1924 and 1925 between the Department of State and the British Foreign Office, through the American Ambassador at London, printed as a note by the Department of State to the original Convention. It there appears that "the establishment of the Irish Free State is not regarded [by the British Government] as affecting . . . the applicability to Ireland of the convention of the 2nd March, 1899, relative to the disposal of real and personal property." Treaty Series, No. 146, *pp.* 3, 4.

In the absence of evidence of any different view in the matter on the part of the political departments either of the Irish Government or our own, we are justified in relying upon the view expressed by the British Government, which we understand to be accepted by the State Department and regarded by it as being presently in force. See, *Sullivan* v. *Kidd*, 254 U. S. 433, 442; *Terlinden* v. *Ames*, 184 U. S. 270, 285, *et seq.*; *Clark* v. *Allen*, 331 U. S. 503; "The Legal Nature of Treaties," 10 Am. Jour. Int. L. 706, 721, 722. It follows that to the extent that our statute conflicts with the provisions of the treaty, the former is superseded by the latter, which must control. U. S. Const., *Art.* 6; *Cf.*, *Dockstader* v. *Kershaw*, 4 Pennewill (Del.) 398.

We accordingly conclude that in accordance with the treaty of 1899, the plaintiffs have an estate by inheritance, and may take their respective interests in the New Hampshire real estate of the decedent for purposes of sale as provided by the treaty. Pursuant to an agreement of the parties, the case is remanded to the Superior Court for further proceedings consistent herewith.

*Case discharged.*

All concurred.