# WILLIAM JOSEPH BROWN ET AL. *v.* DOUG GRIFFITH DODGE CITY, INC.

[No. 188, September Term, 1982.]

*Decided November 4, 1982.*

688

The cause was argued before GILBERT, C. J., and MORTON and ALPERT, JJ.

*Millard D. Bloom,* with whom were *Sibrea & Bloom* on the brief, for appellants.

*William O'B. Finch, Jr.,* with whom were *Beck & Hollman, Chartered* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

This appeal arises under a Consumer Protection Law originally enacted in Maryland by Laws 1941, Ch. 851 and codified as then Md. Ann. Code art. 83, § 111.

We are asked to answer two questions, namely: 1) Did the buyers of a motor vehicle sold to them on a Conditional Sales Contract receive an exact copy of the contract signed by the seller? 2) Does the hand printing of the name of the seller on a line designated "Type Seller's Name" constitute the signature of the seller?

## — THE FACTS —

William Joseph Brown, one of the appellants,[1] purchased a 1978 Dodge Pick-up truck from the appellee, Doug Griffith Dodge City, Inc., trading as "Doug Griffith Dodge City Honda." The truck sold for $10,142. Brown was allowed $1,514 as a trade in on a 1977 Honda. The Dodge was financed over a period of 48 months at $286.64 per month. The deferred purchase price, including credit life insurance and health insurance, taxes and transfer costs totaled $15,312.72.

---

**1.** The other two appellants are Earl Brown, Sr. and Elizabeth Brown, his wife, the father and mother of William Joseph Brown.

Inasmuch as William Brown's credit rating was "weak," he was required to have his parents act as guarantors. The three Browns executed, in quadruplicate, the Conditional Sales Contract on May 3, 1978. The Browns received the third, or yellow copy, of the contract. The "Conditional Sales Contract" used by the appellee was printed in blank and bound at the top in sets of four copies with carbon paper inserted between the copies. The first or white colored copy was designated in red print "BANK COPY," the second, blue colored copy was also designed in red print, "BANK COPY," the third, a yellow colored copy, was styled in red ink as the "CUSTOMER'S COPY," and the fourth, a pink colored copy was entitled "DEALER COPY." The designations of the copies appeared at the foot of the obverse side of each of the four leaves constituting the set.

The following is the pertinent part of the contract received by the Browns:

The blue or "Bank Copy," as well as the pink or "Dealer Copy" contained additional information on the line above the printed legend "Seller's Signature" and on the line above the words bearing the legend "Type Name and Title." Mr.

Thomas E. Saunders, the then Sales Manager of the appellee, signed his name "T.E. Saunders" on the line for the Seller's signature and printed "Thomas E. Saunders S/MGR" on the line where name and title was to appear.[2] The contract, on its face, was assigned "to The Equitable Trust Company in accordance with the terms of the Assignment on the reverse side" of the contract, "subject to full recourse . . . unless checked and initialed on the reverse side hereof." The Bank's copy and the Dealer's copy are "checked and initialed." Each of those copies bears the initials "TES."

William Brown made eighteen payments on the truck, for a total of $5,159.52. Of course, those payments were in addition to the "down payment" of $1,554. The vehicle was repossessed by Equitable, who sold it at public auction. The sale resulted in a deficiency of $3,311.60, which had not been paid at the time of trial in the instant case.

All three appellants [3] sued Doug Griffith Dodge City, Inc., in the Circuit Court for Carroll County. The Browns' declaration alleged that the conditional sales contract between them and Doug Griffith Dodge City was not executed by the defendant and was, pursuant to the Md. Com. Law Code Ann. § 12-605 (1975), null and void.

The matter was heard non-jury. In testimony, Thomas E. Saunders disclosed that his duties as Sales Manager for the appellee were "[t]o oversee the Sales Department, contracts, bill of sales [sic], supervise." Mr. Saunders said that he was required to approve all contracts, and that he was authorized to sign the contracts on behalf of Doug Griffith Dodge City, Inc. Saunders, in describing the "general procedure," related that

"a bill of sale was made up . . ., the order, and that would be approved by myself and the customer. Once that's signed, the financing was available, then a contract was drawn up by the finance man-

---

2. The customer's copy also failed to contain the name of the Credit Life Insurance Company, although that information does appear on the other copies.

3. See n. 1, supra.

ager. The parties involved would sign it, it would be brought to me, I would sign it, then it would be given to the customer, his copy, and we kept a copy, and a copy went to the bank." [4]

Saunders then told the trial judge that the same practice was used in the matter *sub judice.* He testified that the contract, including the acknowledgements at the end of the obverse side of the contract, was signed by the Browns before the contract was taken to him for signature. Mr. Saunders said, "I won't sign a contract until everybody else had signed it." The witness remembered the Brown transaction because "it was the most expensive vehicle we had there, and that stands out in my mind. I remember that specifically. It was red and black and had everything on it. — I think."

Mr. Saunders explained to the court that it was possible his signature did not appear on the "customer's copy" because "the carbon paper could've been folded up or turned up before . . . [he] signed it." Saunders was not asked, nor did he explain why his initials do not appear on the reverse side of the "customer's copy," where carbon paper would play no part, and yet do appear on the "Bank" and "Dealer" copies. Mr. Saunders conceded on cross-examination that it was possible, but not probable, that the customer's copy of the contract was removed before Saunders signed the contract on behalf of the appellee.

Jim Laughter also testified on behalf of the appellee. Mr. Laughter was a salesman for Doug Griffith Dodge City, Inc., when the pick-up truck was sold to Brown. He, too, remembers this particular sale because "in that time I just couldn't comprehend selling a car for $10,000, and we were, you know, shocked."

The trial judge, in reliance upon *In re Horvath,* 1 UCC Rep. Serv. 624, a United States District Court Bankruptcy proceeding, decided in July 1963, declared that "We find as a fact that [the hand printed] words 'Doug Griffith Dodge City Honda' constituted Defendant's signature on the Condi-

---

4. There is no explanation as to what was done with the fourth copy of the contract.

tional Sales Agreement. There has, consequently, been no violation of § 12-605 of the Retail Installment Sales Act."

## I.

We commence our discussion by noting that there are two issues before us. If the trial judge is correct that the hand printed words "Doug Griffith Dodge City Honda" are a signature, the other issue falls of necessity. Therefore, we shall first determine whether those hand printed words are a signature within the meaning of the statute.

The appellee points to the trial judge's fact finding and reminds us that in a non-jury trial, the judgment of the trial court is not to be set aside unless it is clearly erroneous. Md. Rule 1086.

To arrive at the decision it made, the trial court was required to ignore the testimony of the appellee's then sales manager to the effect that he approved all sales contracts and was authorized to bind the company. There is no evidence within the record to support the trial judge's finding that the hand printed words "Doug Griffith Dodge City Honda" was intended to be a signature. On the contrary, any fair reading of Mr. Saunders' testimony reveals that it was his signature and his signature alone that consummated the sale. Moreover, the person who printed the appellee's business name on the contract lacked authority to bind the company.

The trial judge relied upon the definition of "signed" as found in the Commercial Law art. § 1-201 (39). There it is said:

> " '*Signed*' includes any symbol executed or adopted by a party with present intention to authenticate a writing."

He further found the Bankruptcy Referee's reasoning in *Horvath* compelling. We think *Horvath* to be inapposite in the light of the testimony of the appellee's sales manager as to the procedure followed by appellee in obtaining approval of a sales contract. Since the person who actually hand

printed the words "Doug Griffith Dodge City Honda" could not have bound the appellee, he could not have had the intent to use that verbiage as a symbol to authenticate the document. That task was left exclusively to Mr. Saunders, the sales manager.

We hold, therefore, that the trial judge was clearly erroneous in his fact finding. Additionally, the question of whether the hand printed name of the appellee constituted a signature is a question of law, not fact. In any event, the conclusion reached by the trial court was incorrect, and we reverse it.

## II.

The second issue posed by this appeal was not decided by the trial court inasmuch as it felt, we infer, that there was a signature on the contract, and an "exact copy" was furnished to the Browns.

Ordinarily, this Court will not "decide any point or question which does not appear ... to have been tried and decided" by the trial court. Md. Rule 1085. We may, however, decide such a question when it is "necessary or desirable for guidance" of the trial court or for the purpose of avoiding the "expense and delay of another appeal." It would serve no purpose to send this case back to the circuit court without a discussion of Commercial Law art. § 12-605. Therefore, we shall invoke the power conferred upon us by Rule 1085 and turn our attention to the second issue.

The General Assembly, by Laws 1941, Ch. 851, enacted a new section entitled "Retail Installment Sales" to the then Md. Ann. Code art. 83, Sales. Research Report No. 6, styled, "Retail Instalment [5] Selling" makes clear that the legislation was adopted for the purpose of protecting Maryland buyers from abuses by "a minority of sellers." [6] The report was filed with the Legislative Council prior to the adoption of the statute by the General Assembly.

---

5. The word "installment" may also be spelt with one "l." *American Heritage Dictionary of the English Language* (1970), p. 680.

6. Research Report No. 6 was written by Charles Mindel, Esq.

The Act then provided in pertinent part:

"Retail Instalment Sales.

111. *Form and Delivery of Instalment Sale Agreements.*

(a) Every instalment sale agreement shall be evidenced by an instrument in writing containing all of the agreements of the parties. It shall be signed by all the parties before the seller delivers to the buyer any of the goods covered by the agreement.

(b) At or before the time the buyer signs the instrument, the seller shall deliver to him an exact copy of it. If that copy was not executed by the seller, then unless the seller within fifteen (15) days after the buyer has signed, delivers him a copy of the instrument signed by the seller, the agreement and the instruments signed by the buyer shall be absolutely void without any action by the buyer, and the seller shall immediately refund to the buyer all payments and deposits theretofore made.

\* \* \*

130 *Waivers by the Buyer.* No act, agreement, or statement of any buyer in any instalment agreement, shall constitute a valid waiver of any benefit or protection under the provisions of this subtitle."

During the ensuing years, the statute survived with minimum changes, and it lives on in Md. Commercial Law Code Ann. § 12-605 (1975). It now provides:

"(a) . . . (1) At or before the time the buyer signs an installment sale agreement, the seller shall deliver to him an exact copy of it.

(2) If the seller does not sign the copy, and if, within 15 days after the buyer signs the installment sale agreement, the seller does not deliver to the buyer

a copy of it signed by the seller, the installment sale agreement and the instruments signed by the buyer are void without any action by the buyer, and the seller immediately shall refund to the buyer all of his payments and deposits.

(b) . . . (1) Until the buyer signs an installment sale agreement and receives a copy of it signed by the seller, he has an unconditional right to cancel it and receive immediate refund of all payments and deposits made on account or in contemplation of it."

Former section 130 of the original act now appears in slightly modified language in Commercial Law Art. § 12-629:

"No act, agreement, or statement of a buyer in an agreement may constitute a valid waiver of any benefit or protection provided to him under this subtitle."

Our review of the statutes of all 50 states discloses that none of these laws mirrors the Maryland requirement that an "exact copy" of the contract "signed by the seller" be delivered to the buyer and that failure to deliver such a copy within the time specified renders the contract "absolutely void." [7]

---

**7.** Ten states mandate that a notice be included in the contract which informs the buyer that he is entitled to an "exact copy" of the contract he signs and also calls for the seller to deliver to the buyer a copy of the contract signed by the seller. Each of these states also commands that both parties sign the contract and that the buyer should not sign a contract not filled in completely. *Read together, those statutes, to us, require essentially the same thing as Maryland.* The states so providing are: Florida — Fla. Stat. Ann. § 520.34 (West 1972); Georgia — Ga. Code Ann. § 10-1-32 (1982); Illinois — Ill. Ann. Stat. ch. 121 1/2, § 573 (1982); Louisiana — La. Rev. Stat. Ann. § 6:956 (West 1982); Massachusetts — Mass. Ann. Laws ch. 255B, § 13 (Michie/Law Co-op. 1980); Mississippi — Miss. Code Ann. § 63-19-31 (1972); Missouri — Mo. Ann. Stat. § 408.260 (Vernon 1979); Montana — Mont. Code Ann. § 31-1-231 (1981); New Hampshire — N.H. Rev. Stat. Ann. § 361-A:7 (1966); New Mexico — N. M. Stat. Ann. § 58-19-7 (1978).

Pennsylvania, however, demands that the seller provide the buyer with an "exact copy" of the contract at the time the buyer signs the contract and that "the contract shall contain the signature of the seller identical with such signature on the original contract." Pa. Stat. Ann. Tit. 69 § 613 (Purdon 1965).

Shortly after the "Retail Instalment Sales Act" became an integral part of our statutory law, the Court of Appeals was

The Wisconsin statute declares that the buyer is entitled to an "exact copy" of the contract he signs, and it compels the seller to retain "a copy" of the contract. The copy must be available to the consumer, on demand, for a period of one year after the last scheduled payment. Wis. Stat. Ann. § 422.303 (West 1974).

A large number of states compel the seller's delivery to the buyer of "a copy" of the contract signed by both parties or at the time of execution. *See* Connecticut — Conn. Gen. Stat. Ann. § 42-84 (West 1981) ("a completely filled in copy"); Hawaii — Hawaii Rev. Stat. § 476-4 (1976); Idaho — Idaho Code § 48-603 (1977; Iowa — Iowa Code Ann. § 322.17 (West 1977); Kentucky — Ky. Rev. Stat. Ann. § 190.100 (Bobbs-Merrill 1980); Michigan — Mich. Comp. Laws Ann. § 566.302, Sect. 2 (1967); Minnesota — Minn. Stat. Ann. § 168.71 (West 1960); Nebraska — Neb. Rev. Stat. § 45-336 (1943); New York — N.Y. Pers. Prop. Law § 302 (Consol. 1977); Ohio — Ohio Rev. Code Ann. § 1317.02 (Page 1979); South Dakota — S.D. Codified Laws Ann. § 54-7-26 (1980); West Virginia — W. Va. Code § 17A-6-17 (1974). *See also* Puerto Rico — P.R. Laws Ann. tit. 10, § 751 (1976).

Five states obligate the seller to deliver to the buyer "a copy" of the contract as accepted by the seller: Alaska — Alaska Stat. § 45.10.020 (1980); Nevada — Nev. Rev. Stat. § 97.175 (1965); South Carolina — S.C. Code Ann. § 56-17-30 (Law Co-op 1976) (also specifies buyer's right to "exact copy" of contract he signs.); Texas — Tex. Rev. Civ. Stat. Ann. art. § 5069-7.02 (Vernon 1981 Suppl.); Vermont — Vt. Stat. Ann. tit. 9, § 2405 (1970).

Four states charge the seller with the duty of providing the buyer with "a copy" of the agreement at the time the buyer signs, but they do not require that the copy contain the seller's signature. Those states are: California — Cal. [Civil] Code § 1803.7 (West 1973); Maine — Me. Rev. Stat. Ann. tit. 9-A, § 3-202 (1982); New Jersey — N.J. Rev. Stat. § 17.16C-23 (1970); North Dakota — N.D. Cent. Code § 51-13-02 (1960).

Oregon instructs the seller to deliver to the buyer "a copy" of the contract signed by the seller. Or. Rev. Stat. § 83.540 (1981).

A few states dictate that the seller deliver to the buyer a writing, but not necessarily the contract itself, containing the agreement of the parties: North Carolina — N.C. Gen. Stat. § 20-303 (1978); Rhode Island — R.I. Gen. Laws § 6-27-4 (1976); Tennessee — Tenn. Code Ann. § 47-11-103 (1979); Virginia — Va. Code § 46.1-545 (1950).

Those states obligating the seller to provide the buyer with a "completely filled in" copy of the agreement are: Arizona — Ariz. Rev. Stat. Ann. § 44-286 (1967); Delaware — Del. Code Ann. tit. 6, § 4304 (1974).

Several states have adopted the Uniform Consumer Credit Code's general disclosure provision. That code directs that the disclosures required by U.C.C.C. be in writing and that "a copy" be delivered to the buyer: Colorado — Colo. Rev. Stat. § 5-2-302 (1973); Indiana — Ind. Code Ann. § 24-4.5-2-302 (Burns 1982); Oklahoma — Okla. Stat. Ann. tit. 14A, § 2-302 (West 1972); Utah — Utah Code Ann. § 70B-3-302 (1980); Wyoming — Wyo. Stat. § 40-14-223 (1977).

The State of Washington decrees that the seller deliver to the buyer, at the time the buyer signs the contract, "a copy" of the contract as signed by the buyer. If, however, the contract is accepted at a later date by the seller, then the seller must mail the buyer a copy of the contract as accepted by the seller.

We did not locate the statutes, if any there be, on the subject in Alabama, Arkansas, or Kansas.

called upon to construe part of it in *Stride v. Martin*, 184 Md. 446, 41 A.2d 489 (1945). There the Court considered a situation wherein Stride had purchased a 1936 Packard from Martin, an automobile dealer. The purchase was financed over a period of twelve months. The contract received by Stride contained unfilled blanks relative to the trade-in, the number of periodic payments, other "blanks", and the seller did not sign the contract. The Court noted that "[t]here was no evidence that 'Stride' was prejudiced by the fact that the copy received by her was not 'signed by the seller.'"

*Stride* became dissatisfied with the Packard and demanded the return of her money and the Plymouth she had used as a trade-in. Martin refused to comply, and he threatened to repossess the Packard, notwithstanding that the contract was not in default.

In construing the act, the Court said:

> "The legislative history of the act, and both the similarities and the differences between such legislation in different jurisdictions, indicate that the words of the act were chosen with care."

Judge Markell, for the Court, observed that the Maryland statute was "more explicit — more drastic perhaps — than corresponding provisions in other jurisdiction." [8] 184 Md. at 452.

The *Stride* Court brushed aside an argument concerning the buyer's signing of the acknowledgment saying:

> "Except in favor of an assignee without knowledge, the acknowledgment is not conclusive. The contract itself (on which the acknowledgment was signed) shows that it was not executed by the seller 'at the time of execution' of the acknowledgment." [9]

While the *Stride* Court specifically left open "any questions as to the construction or application of . . . [§ 12-605 (a) and

---

8. *See* n. 7, *supra.*

9. For a case involving an assignee without notice, *see* Associated Acceptance v. Bailey, 226 Md. 550, 174 A.2d 440 (1961). *See also* Commercial Law art. § 12-630 (b).

(b) of the Commercial Law art.] in the . . . [*Stride*] case or on different facts," we must address that very question.

We are cognizant that the appellant, William Brown, had full use of the Dodge pick-up for eighteen months, and that he possessed the unsigned contract for that period of time but did nothing about it until a deficiency arose out of the repossession by Equitable of the truck. It was then and only then that Brown invoked Commercial Law art. § 12-605 and demanded a refund of the monies paid for the vehicle. Nevertheless, the right of the buyer to cancel "is a frequently utilized remedy in consumer protection legislation. *See, e.g.,* [Md. Ann.] Code (1975) §§ 14-302 to 14-303 of the Commercial Law Article, . . . § 10-102 of the Real Property Article." *Dennis v. City of Rockville,* 286 Md. 184, 192, 406 A.2d 284 (1979).

The law is clear, definite, and unambiguous: If *a seller, under an installment sales contract, fails to deliver to the buyer an exact copy of the contract, signed by the seller, the contract is null and void.* All monies paid thereunder must be returned to the buyer. Commercial Law art. § 12-605 (a) and (b).

The result we think to be dictated by the statute is harsh with respect to the appellee, Doug Griffith Dodge City, Inc., but it is to be borne in mind that the Legislature wanted to protect the buyer. To accomplish that end, it placed severe penalties upon sellers who failed to comply with the statutory requirements of the Retail Sales Instalment Act.

When the Court of Appeals decided *Stride,* it made manifest that it could not assume "a dispensing power not conferred by the act . . ., or by creating exceptions or artificial estoppels which would shift upon the buyer the seller's responsibility for neglect to comply with statutory requirements designed for the buyer's protection." 184 Md. at 452.

We are compelled to apply the statute as we find it. We are not free to enact amendments or exceptions, or otherwise alter its clear language. It is not for us to decide the wisdom, *vel non,* of the statute, but, rather, to enforce it as it is written. *Techt v. Hughes,* 229 N.Y. 222, 128 N.E. 185 (1920).

The Legislature has met many times since the Court handed down its opinion in *Stride*. The General Assembly knew that the "blanks" in the Stride-Martin contract resulted in no prejudice at all to the buyer. It further knew that notwithstanding the lack of prejudice, the Court had voided the contract because of the "blanks" and the lack of signature by the seller. If the General Assembly felt that the Court's interpretation was unduly narrow or restrictive, then it had but to amend the statutory language. During the thirty-seven years that have passed since *Stride,* no significant change has appeared in the statute.

Society as a whole, the Legislature of the State, and the Congress of the United States have all become much more consumer oriented than their 1945 counterparts. We believe that if the *Stride* result was required in the 40's, it is mandatory today.

We think the circuit court unwittingly attempted to create an estoppel or to carve an exception from the statute's ambit. In so doing, it erred. We, therefore, reverse the judgment and remand the matter for the entry of a judgment in favor of the appellant against appellee for the total amount of monies paid by the appellant under the null and void Conditional Sales Contract.

> *Judgment reversed.*
> *Case remanded to the Circuit Court*
> *for Carroll County for further pro-*
> *ceedings in accordance with this*
> *opinion.*
> *Costs to be paid by appellee.*